**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AHMAD MUAFFAQ ZAIDAN, *et al.*,<br><br>            Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP*, et al.*,<br><br>            Defendants. | Civil Action No. 17-00581 (RMC) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Jeffrey D. Robinson (D.C. Bar #376037)
*jeffrey.robinson@lbkmlaw.com*
Tara J. Plochocki (D.C. Bar #989404)
*tara.plochocki@lbkmlaw.com*
**LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC**
1899 Pennsylvania Ave. NW,
Suite 600
Washington, D.C.  20006
(202) 833-8900

Jennifer Gibson (Cal. Bar #288516)
Reprieve
P.O. Box 72054
London EC3P 3BZ
+44 (0)207 553 8152

July 11, 2017                                     *Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

    1.  The Government's Kill List and Program of Targeting Individuals for Lethal
        Action................................................................................................................................3

    2.  Plaintiffs' Work as Journalists Places Them in Close Proximity to Terrorists...................4

        a.  Plaintiff Zaidan ................................................................................................4

        b.  Plaintiff Kareem ...............................................................................................5

ARGUMENT ...........................................................................................................................7

    A.  THE FACTS ALLEGED ARE SUFFICIENT TO STATE A PLAUSIBLE
        CLAIM FOR RELIEF ...........................................................................................7

        1.  The Facts Alleged Must Be Taken As True...................................................7

        2.  Defendants Improperly Dispute Factual Allegations....................................8

        3.  Plaintiffs Credibly Plead that They Are on the Kill List .............................9

    B.  PLAINTIFFS PLEAD A PLAUSIBLE INJURY AND HAVE
        CONSTITUTIONAL STANDING ................................................................14

    C.  PLAINTIFFS' APA CLAIMS ARE NOT FORECLOSED BY THE POLITICAL
        QUESTION DOCTRINE .............................................................................17

        1. The APA Permits Review of Agency Action with Respect to Putting Plaintiffs
          on the Kill List ...............................................................................................18

        2. The Government Does Not Have the Discretion to Violate the Law ...........................21

CONCLUSION.......................................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Clapper*,
   785 F.3d 787 (2d Cir. 2015)............................................................................ 10

*Al Shimari v. CACI Premier Tech., Inc.*,
   840 F.3d 147 (4th Cir. 2016) ......................................................................... 21

*Al-Aulaqi v. Obama*,
   727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................ 15, 20

*Al-Aulaqi v. Panetta*,
   35 F. Supp. 3d 56 (D.D.C. 2014) ............................................................ 15, 20

*Alfred A. Knopf, Inc. v. Colby*,
   509 F.2d 1362 (4th Cir. 1975) ....................................................................... 10

*Am. Nat'l Ins. Co. v. FDIC*,
   642 F.3d 1137 (D.C. Cir. 2011) ....................................................................... 8

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)............................................................................. 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................. 8, 9, 11

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ...................................................................................... 15

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................... 8, 9

*bin Ali Jaber v. United States*,
   No. 16-5093, 2017 WL 2818645 (D.C. Cir. June 30, 2017) ................................. 23

*Chamber of Commerce of the U.S. v. EPA*,
   642 F.3d 192 (D.C. Cir. 2011) ....................................................................... 15

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ....................................................................... 23

*Evangelou v. District of Columbia*,
   901 F. Supp. 2d 159 (D.D.C. 2012) .......................................................... 8, 13

*Fares v. Smith*,
   No. CV 16-1730(CKK), 2017 WL 1319716 (D.D.C. Apr. 7, 2017) .................. 20-21

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ....................................................................... 14

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006)................................................................................ 19, 23

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)................................................................................ 22, 23

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ............................................................................................. 15

*Humane Soc'y of the U.S. v. Vilsack,*
  797 F.3d 4 (D.C. Cir. 2015) ............................................................................ 14

*In re XE Servs. Alien Tort Litig.,*
  665 F. Supp. 2d 569 (E.D. Va. 2009) ............................................................. 22

*Int'l Refugee Assistance Project v. Trump,*
  857 F.3d 554 (4th Cir. 2017) .......................................................................... 23

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) .......................................................................... 9

*Lucas v. S.C. Coastal Council,*
  505 U.S. 1003 (1992) ....................................................................................... 16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ......................................................................................... 16

*Mata v. Lynch,*
  135 S. Ct. 2150 (2015) ..................................................................................... 18

*Mountain States Legal Found. v. Glickman,*
  92 F.3d 1228 (D.C. Cir. 1996) ........................................................................ 15

*NRDC v. EPA,*
  464 F.3d 1 (D.C. Cir. 2006) ............................................................................ 14

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
  182 F.3d 17 (D.C. Cir. 1999) .......................................................................... 21

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
  489 F.3d 1279 (D.C. Cir. 2007) ...................................................................... 14

*Safe Extensions, Inc. v. FAA,*
  509 F.3d 593 (D.C. Cir. 2007) ........................................................................ 18

*SEC v. e-Smart Techs., Inc.,*
  926 F. Supp. 2d 231 (D.D.C. 2013) .................................................................. 8

*Sierra Club v. Jewell,*
  764 F.3d 1 (D.C. Cir. 2014) ............................................................................ 14

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ........................................................................ 18

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.,*
  389 F.3d 1251 (D.C. Cir. 2004) ........................................................................ 9

*Z St., Inc. v. Koskinen,*
  44 F. Supp. 3d 48 (D.D.C. 2014) .................................................................... 19

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) .................................................................................. 19, 21

## STATUTES

5 U.S.C. § 702 ............................................................................................................. 2, 8, 18

5 U.S.C. § 704 ................................................................................................................... 18

18 U.S.C. § 956 .............................................................................................................. 19, 22

18 U.S.C. § 2441 ............................................................................................................ 19, 22

28 U.S.C. § 1331 ................................................................................................................. 18

## **INTRODUCTION**

Defendants violated the Administrative Procedure Act by targeting two journalists for death without providing them any opportunity to challenge the erroneous conclusion that they were or supported terrorists. The complaint alleges detailed facts supporting the allegation that each plaintiff is on the United States' "kill list." The allegations are based on specifically identified documents, statements by government officials, and other evidence of the existence of a program by which purported terrorists are placed on a kill list. The allegations also include i) the results of a metadata tracking and analysis program in which plaintiff Zaidan is presented as the top scoring courier for Al Qaeda Senior Leadership and ii) multiple documented drone strikes against plaintiff Kareem, made only days apart, that nearly killed him while he was in his vehicles, his office, and filming an interview.

Defendants have admitted publicly that they administer the program by which plaintiffs were designated and targeted for lethal action. In addition, defendants have declassified and made public the process by which such designations are made. In moving to dismiss the complaint for lack of standing and failure to state a claim, they do not deny that there is a "kill list," nor that plaintiffs are on it. Rather they argue that the complaint is speculative and based on "an implausible chain of possibilities." This argument does not present a basis for dismissal here.

- At this juncture, all factual allegations must be taken as true, and inferences drawn in plaintiffs' favor. Following this well-settled standard, there is no basis to dismiss the complaint.

- The government does not actually dispute the plausibility of plaintiffs' claim for entitlement to relief, but rather just the underlying pleaded fact that they are on the kill

list.  Disputes about the truth or falsity of the facts alleged, especially where the alleged fact is in the exclusive knowledge of the defendants, have no place in a motion to dismiss.

- Plaintiffs credibly allege that they are on the kill list with facts based on statements of the defendants, publicly available documents and firsthand experiences.

- These same facts easily support a plausible claim that plaintiffs have a cognizable injury.  They have standing, and they are entitled to relief under the APA.

Defendants also contend that the designation of civilians for assassination outside the United States is a non-justiciable political question, but this is incorrect.  The Administrative Procedure Act, 5 U.S.C. §702, entitles any person aggrieved by agency action to judicial review of the offending determination for compliance with law.  Indeed, its express purpose is to give courts jurisdiction over and the authority to evaluate actions by executive agencies.  In this case, there are clear standards to be applied, based on the defendants' declassified procedural standards for designating individuals as targets for lethal action and a host of domestic and international laws designed to protect civilians from deliberate killing.  Moreover, there are constitutional rights at issue, the adjudication of which fall within the exclusive purview of this Court.  Conducting this inquiry will not require the Court to enter the battlefield, but rather, evaluate determinations made in meeting rooms in this District, an exercise it performs on a routine basis.

Having pleaded sufficient factual allegations, plaintiffs should be permitted to pursue their claims, and the Motion to Dismiss should be denied.

## FACTUAL BACKGROUND

### 1. The Government's Kill List and Program of Targeting Individuals for Lethal Action

The U.S government admits that it conducts lethal strikes targeted at individuals who are selected as the result of a process in which they are nominated for lethal action by one or more of the defendants, who then discuss the nomination.  Compl. ¶ 55.  This process is set forth in the Presidential Policy Guidance ("PPG"), issued in May 2013 and declassified on August 6, 2016. *Id.* ¶¶ 58-59.  The government also admits that senior officials in our government nominate and review the proposals to take lethal action against particular individuals, whether identified by name or phone number or other data.  *Id.* ¶ 56.  The PPG does not require agencies to ascertain the name of the target before taking lethal action.  *Id.* ¶ 61; PPG § 1.F.

The government selects individuals for lethal action by drawing conclusions from metadata, as confirmed by former CIA director Michael Hayden, who stated publicly in May 2014 that "[w]e kill people based on metadata."  *Id.* ¶ 61.  An NSA program called SKYNET, which is used by defendant CIA, collects the metadata on which kill list designations are based. *Id.* ¶ 60.  SKYNET identifies potential targets based on metadata analysis and cellphone tracking.  It purports to apply "complex combinations of geospatial, geotemporal, pattern-of-life, and travel analytics to bulk DNR [Dial Number Recognition] data to identify patterns of suspect activity."  *Id.* ¶ 34.  This information can be found in a publicly available document entitled "SKYNET: Applying Advanced Cloud-based Behavior Analytics."  *Id.* ¶ 33.  Another publicly-available document, SKYNET: Courier Detection via Machine Learning, describes how defendants have used SKYNET to detect couriers for Al Qaeda Senior Leadership (ASQL).[1]

---

[1] Plaintiffs did not specifically cite this document in the complaint, but relied on it to support the allegations made therein.

### 2. Plaintiffs' Work as Journalists Places Them in Close Proximity to Terrorists

As described in detail in the complaint, plaintiffs Zaidan and Kareem are journalists who report on terrorism in the Middle East and Afghanistan and Pakistan. Each has interviewed persons whom the U.S. would consider to be Islamic militants or terrorists. But neither Zaidan nor Kareem are militants themselves, nor do they provide support to persons interviewed for their respective publications. They are frequently in close proximity to militants and/or terrorists; their travel patterns are similar to actual members of such groups. Each plaintiff uses equipment, such as cell phones and laptops, which allows them to be tracked while interviewing sources.

#### a. Plaintiff Zaidan

Zaidan is a journalist and the former head of Al Jazeera's Islamabad Bureau. He has covered the Middle East, the "War on Terror", and terrorism for many years. *Id.* ¶ 26. In the course of his reporting, he has traveled to and interviewed numerous individuals in regions where terrorists are active, including Pakistan, Afghanistan, and Syria. *Id.* He has also interviewed known terrorists—most notably, he secured the first-ever interview with Osama bin Laden. *Id.* ¶¶ 28, 30-31. His work has been featured by other well-established media outlets, including CNN and PBS Frontline. *Id.* ¶ 29. Zaidan was one of the first journalists to enter areas controlled by the Free Syrian Army. Reports he authored in May 2015 angered the Assad regime, and Syrian State Television falsely claimed that Zaidan was a member of Al Qaeda. *Id.*

As set forth in the SKYNET metadata report, also apparently published in May 2015, Zaidan was among the persons tracked by SKYNET. The report singles him out as the "highest scoring" target among the tracked couriers for Al Qaeda Senior Leadership who traveled to Peshawar and Lahore. He is the only person specifically identified in the courier-tracking study,

4

which describes him as a member of Al Qaeda and the Muslim Brotherhood, and notes that he works for Al Jazeera. *Id.* ¶ 33. Zaidan is not a courier for al-Qaeda leaders, nor is he a member of Al Qaeda or the Muslim Brotherhood (though he does work as a journalist for Al Jazeera). The media reported that Zaidan was targeted by defendants, at which time he left Pakistan for Al Jazeera headquarters in Qatar. *Id.* ¶ 37. He continues his work as a journalist, but remains at risk that the U.S. will kill him.

### b. Plaintiff Kareem

Kareem's work as a journalist reporting for On the Ground News ("OGN") in Syria puts him in frequent contact with militants. He is one of the only Western journalists with access to rebel fighters, and conducts interviews with them using recording equipment and radio devices such as cellphones, satellite phones, and handheld receivers. *Id.* ¶ 45. Like Zaidan, Kareem is not a terrorist, nor is he a member of any terrorist organization or a threat to the United States or its citizens. Compl. ¶¶ 42-43. Kareem has been the target of aerial attacks with peculiar frequency at close intervals in disparate locations. He has been narrowly missed by drone attacks five times. As the complaint makes clear, these strikes did not occur during ongoing battles or in the course of attacks that indiscriminately rained down missiles. Rather, as described in the complaint, these were surgical strikes targeting Kareem's precise location on otherwise uneventful days—twice at his office, twice in his vehicle when he and his crew were out reporting, and the exact spot where Kareem had been interviewing the owner of a local supermarket. *Id.* ¶¶ 47-51.

The attacks cannot be attributed to mistake or coincidence. Kareem is a peripatetic, very active reporter. It is difficult to predict where he is going to be at any given time, yet for each of these strikes, Kareem was not only physically present, but the strike landed within yards of his

location with no other conceivable target.  Moreover, four of the five strikes were within the same 30-day period in June 2016.  It would be wholly implausible to conclude that this was simply a case of very bad luck.

The first strike occurred in early June 2016.  Kareem returned to the OGN office after he had been out filming with his crew.  All of a sudden, he heard approaching aircraft of some kind.  There was a strike and it directly hit the OGN office Kareem had just run into for shelter.  *Id.* ¶ 47.  Several days later, Kareem traveled to another town—Hariyataan—to interview a supermarket owner.  While Kareem and his cameraman were staging the shot on the street, he heard drones buzzing above.  They started to walk away, and the drones fired on the exact spot they had been filming in the middle of the street.  *Id.* ¶ 48.  The third strike also occurred while Kareem and his crew were reporting, this time in a different area called Khantounam.  Kareem noticed that a drone had been circling where he and his team were filming.  Kareem was taking a break, sitting in a truck under a tree, when the drone launched a Hellfire missile, which struck and completely destroyed Kareem's vehicle.  His bulletproof vest absorbed the shock and debris, saving his life.  *Id.* ¶ 49.  Only two days later, on June 28, 2016, the OGN office was targeted *again* while Kareem was present, the missile killing several civilians in the building.  *Id.* ¶ 50.  Finally, Kareem was targeted when he was driving his own car with an OGN crew in mid-August 2016, on their way to the Artillery College in Aleppo.  Rebels had seized control of the school in early August, and Kareem and his team intended to go film the area as it appeared after the battle.  While Kareem and the OGN crew were still en route, a huge blast erupted yards from his car, and for the fifth time in two months, he was nearly killed by a drone strike.  *Id.* ¶ 51.

**ARGUMENT**

Plaintiffs have acquired information that the U.S. has targeted them for lethal action and in a manner which constitutes an abuse of discretion, is arbitrary and capricious, contrary to law, exceeds statutory authority, and violates the Constitution.  The government contends that it is not plausible that plaintiffs are on its kill list and that therefore the complaint fails to state a claim or allege injury sufficient to meet the threshold for constitutional standing.  However as discussed below, arguing the truth or falsity of facts in the complaint is inappropriate on a motion to dismiss, and in any event the facts adequately support plaintiffs' claims and sufficiently plead a cognizable injury.

Defendants also attempt to bar this Court's review of the plaintiffs' designations by invoking the political question doctrine, but here, too, their motion fails.  The defendants themselves have acknowledged that some standards should guide the process by which the "kill list" is created, and plaintiffs seek nothing more than an ordinary vindication of constitutional and statutory rights to be free from unlawful and arbitrary agency action that harms them.  Multiple laws—statutes and treaties—restrict Executive discretion to target civilians for lethal action, and such determinations are subject to judicial review.

**A.   THE FACTS ALLEGED ARE SUFFICIENT TO STATE A PLAUSIBLE CLAIM FOR RELIEF**

*1.   The Facts Alleged Must be Taken as True*

Defendants' disagreement with the truth of a fact alleged, or presentation of an alternate theory of the facts alleged, does not constitute grounds for dismissal of the complaint.  Quite the opposite.  On a motion to dismiss a complaint, "the factual allegations presented in it must be presumed true and should be liberally construed in plaintiff's favor . . . and plaintiff must thus be given every favorable inference that may be drawn from the allegations of fact.  *SEC v. e-Smart*

*Techs., Inc.*, 926 F. Supp. 2d 231, 235 (D.D.C. 2013).   To survive a motion to dismiss, a complaint must state a plausible claim for relief.   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 589 (2007).   A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Twombly*, 550 U.S. at 556).   An inference of liability need not be the only inference that could be drawn—"only [] among the set of plausible inferences." *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012).   Moreover, nothing in *Twombly* or *Iqbal* changed the ability of a plaintiff to plead facts "peculiarly within the possession and control of the defendant" on information and belief to support a claim; those facts must only raise a "reasonable expectation that discovery will reveal evidence" of liability.   *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

   *2.   Defendants Improperly Dispute Factual Allegations*

   Plaintiffs' claim is that defendants violated applicable law, abused their discretion and were arbitrary and capricious in their inclusion of plaintiffs—innocent journalists—on the kill list, and that this harm accordingly entitles plaintiffs to judicial review of this decision under 5 U.S.C. § 702.   Defendants do not challenge the plausibility of plaintiffs' innocence or that they are in fact committed professional journalists.   The government urges this Court to discount plaintiffs' factual allegation that they are on the "kill list" as "implausible," but that argument invites error.   Plaintiffs' assertion that they have been placed on the kill list is not a legal conclusion:  it is an alleged fact.   Accordingly, at this juncture, the Court is required to assume the truth of it and all other material allegations and give the plaintiffs "the benefit of all inferences that can be derived from the facts alleged."   *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

Any dispute as to the fact of whether plaintiffs are on the kill list is both premature and unfair.  At issue in this lawsuit is a determination made by defendants in secret.  The additional evidence in support of plaintiffs' claims is in defendants' exclusive possession.  While plaintiffs have been able to deduce through other means that they have wrongfully been targeted for lethal action, they cannot reasonably be expected to provide more at this juncture.  The law of this Circuit affords relief to plaintiffs who cannot plead claims with specificity (a standard not required in this case) when defendants control the relevant documents, and plaintiffs do not have access.  *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004).  A factual allegation may be made upon information and belief so long as the plaintiff sets forth the facts upon which the allegation is based and he states that the necessary information lies within defendants' control.  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994).  Plaintiffs have done so here, pleading that upon information and belief defendants added them to the kill list without providing any notice of this classified decision.  That assertion is amply supported by facts alleged in the complaint.  *Twombly* and *Iqbal* are not a license for the defendants to call into question factual allegations, such as whether Kareem *really* saw drones buzzing or circling above, or was struck by missiles fired from "purported" drones at all.  (Mot. at 10).  No matter how "remote," "doubtful," or "unlikely" the facts are in the government's view, the Court must accept them as true.  *Twombly*, 550 U.S. at 556.  On these facts, plaintiffs have pleaded a plausible claim, and this case should proceed to discovery.

### 3.   *Plaintiffs Credibly Plead that They Are on the Kill List*

Even if the Court were inclined, at this stage, to examine the allegations that plaintiffs are on the kill list, it would find that they are amply supported by well-established and publicly known facts.  There is no dispute that defendants covertly nominate individuals to be lethally

targeted.[2]   Indeed, the specific process by which these designations are made has been declassified and published.  Compl. ¶¶ 58-59.

Nor is there any dispute that these decisions are at times based on metadata—that is, tracking cell phone signals, social media accounts, and other digital footprints such as travel. Officials at the highest levels of the government have admitted that it kills people based on metadata, a fact that has been corroborated by documents published online.  SKYNET is a metadata-collection program which identified Zaidan as a member of Al Qaeda and the highest scoring individual in Pakistan in a study of couriers for Al Qaeda Senior Leadership based on his travel patterns.[3]  SKYNET tracks individuals the government believes are members of Al Qaeda. The government contends that plaintiffs cannot show that SKYNET was used to identify him as a target for lethal action, but this is akin to asking the Court to *refrain* from making a plausible inference.  SKYNET identifies potential terrorists for summary execution.  Compl. ¶ 60.  It has

---

[2] According to defendants, targeted drone strikes are not rare occurrences.  In July 2016, the President disclosed that between 2009 and 2015, the government had killed up to 116 civilian bystanders and 2,581 terrorist suspects in 473 drone strikes outside areas of active hostilities. Office of the Dir. of Nat'l Intelligence, Summary of Information Regarding U.S. Counterterrorism Strikes Outside Areas of Active Hostilities 1 (July 1, 2016), *available at* https://www.dni.gov/files/documents/Newsroom/Press%20Releases/DNI+Release+on+CT+Strik es+Outside+Areas+of+Active+Hostilities.PDF.

[3] The Government contends that it cannot confirm or deny the authenticity of leaked classified documents, and therefore the Court should disregard them.  This is nonsense.  The Government's policy of not commenting on leaked documents does not limit plaintiffs from pleading or the Court from evaluating claims based on these documents.  Plaintiffs are free to use this information as the basis for their litigation and there is no principle of law that says otherwise. Indeed, the Second Circuit's decision on the illegality of the NSA program was admittedly based on classified documents leaked by Edward Snowden.  *ACLU v. Clapper*, 785 F.3d 787, 829 (2d Cir. 2015).  Defendants cite to *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) for the proposition that Plaintiffs should not cite to leaked intelligence documents.  This is demonstrably false, and in any event is not at all what that case stands for.  In *Knopf*, the Fourth Circuit considered whether a former CIA official could publish classified information that had already been leaked.  The Court examined a government official's obligation to maintain secrecy, and acknowledged that others were free to "republish previously published material."

identified Zaidan as not only a terrorist but an important one, working for Al Qaeda senior leadership.[4] It is a fair inference, which the Court is required to draw in plaintiffs' favor, that he has been targeted for summary execution. In addition, Zaidan lived and worked in Pakistan, a country in which hundreds of other individuals have been targeted and killed by the defendants. The media reported that Zaidan had been targeted by defendants. *Id.* ¶ 37. Zaidan need not have been in the room where the decision was made to add him to the kill list in order to credibly plead that he is on it. A reasonable person examining these facts could hardly conclude anything else, and a reasonable inference is all the law requires. *Iqbal*, 556 U.S. at 678.

Kareem alleges that he too has been placed on the kill list by defendants. And, again, although the government should not be litigating this fact here, the facts do support this allegation. Not only did four of the strikes on Kareem occur in a single month, but they specifically targeted him and the OGN crew, his office, and his vehicle in the ordinary course of his conducting interviews. Defendants entreat the Court to imagine that all of the strikes occurred on "battlefields" during a flurry of other attacks by myriad armed forces. As set forth in the complaint this was not the case. For one, none of the strikes was preceded or followed by additional strikes. Each time, there was only one strike, and only on Kareem. The OGN office—hit twice—was not in a battlefield. And, Kareem did not set out to interview a

---

[4] The government also questions whether identification as a potential terrorist and target via SKYNET necessarily means that Zaidan was approved for lethal action. Reports indicate that the US formulated a "disposition matrix" to plan for "the 'disposition' of suspects beyond the reach of American drones." Greg Miller, *Plan for hunting terrorists signals U.S. intends to keep adding names to kill lists*, Washington Post, Oct. 23, 2012, https://www.washingtonpost.com/world/national-security/plan-for-hunting-terrorists-signals-us-intends-to-keep-adding-names-to-kill-lists/2012/10/23/4789b2ae-18b3-11e2-a55c-39408fbe6a4b_story.html?utm_term=.ffa22d6a1787. Whatever ultimate disposition the government landed on with respect to Zaidan—whether capture and interrogation, rendering, or death—he is still entitled to challenge a designation that would result in the deprivation of his freedom in violation of the APA.

supermarket owner on a street in the middle of an aerial assault—indeed, as alleged in the complaint, he and his crew set up a shot in the middle of the street, and walked up a nearby hill to view damage that had previously occurred to nearby homes.   In other words, there was no hostile activity happening at that time, and there is no "battlefield" explanation for the drones circling Kareem on that day.   Kareem waited to visit the Artillery College until well after the battle for control of the college had concluded, and that strike did not happen at the site, but rather as Kareem was driving to it.

Defendants also claim that Kareem has failed to show that any of these strikes were conducted by the United States, but that is wrong.   Among the weapons used against him was at least one drone-launched Hellfire missile, which is the U.S. military's "weapon of choice" in arming drones.[5]   And it was this drone that had been circling Kareem and his film crew when it launched a missile, making a direct hit on their vehicle.   This improbable series of events only makes sense if these drones were targeting Kareem, which is what is pleaded here.

Defendants characterize plaintiffs' claims as "farfetched" and offer a number of other possible scenarios to explain the facts alleged in which plaintiffs are not on the kill list.   But none of the government's alternatives is plausible.   The government argues that Zaidan's allegation that he is on the kill list is speculative simply because SKYNET may be used to identify potential terrorists to be placed on sanctions or no-fly lists, but there is no suggestion that the government did either of these things with respect to plaintiffs, and a search of the SDN list confirms that.   A theory that can be and has been so easily disproven is not plausible.   The government refuses to comment on the document in which Zaidan was the highest scoring individual in a metadata collection analyzing patterns of couriers for al Qaeda, but asks this

---

[5] Jim Wolf, *US to Field Deadlier Missile in War Against al Qaeda*, Reuters, Oct. 14, 2011, http://www.reuters.com/article/usa-missile-hellfire-idUSN1E79D1A820111014

Court to believe that it is "highly unlikely" for an operative allegedly so deeply involved with the senior leadership of al Qaeda—in Pakistan—to be on a kill list.  This explanation's plausibility can be defeated by a quick Google search showing that it is in fact *quite* likely that an al Qaeda operative in Pakistan will be targeted and killed in a drone strike.[6]  Moreover, it is not uncommon for the U.S. to attempt to kill terrorist suspects through targeted killing via drone—the government has admitted that it has launched hundreds of drone strikes and killed thousands of people.  *See* n.2 *supra*.

The facts here also strongly imply that Kareem has been designated for similar lethal action.  The government overlooks the innocuous circumstances in which Kareem was targeted and the eerie precision of the strikes, and instead argues that President Assad of Syria has targeted journalists and ISIS kills them too.  But these are not plausible culprits either; nowhere does the report it cites contend that the Syrian government targets foreign journalists with *drone strikes*, or that the alleged public executions by ISIS occur in the form of a missile launched from a drone.  The fact that Kareem was precisely and repeatedly targeted by missiles, including Hellfire missiles launched from drones, in a short window of time clearly supports the factual allegation that he has been targeted for lethal action by the defendants.  Nothing the government puts forward undermines the plausibility of the claim that plaintiffs were wrongly included on the kill list.  But even if these alternate assertions were plausible, it is not plaintiffs' burden to exclude all plausible explanations that the defendants might "imagine" for the events described in the complaint.  *Evangelou*, 901 F. Supp. 2d at 170.  The plaintiffs are required to just plead one plausible interpretation to survive a motion to dismiss.  *Id.*  They have done so here.

---

[6] Declan Walsh, *Drone Strikes on Al Qaeda Are Said to Take Toll on Leadership in Pakistan*, N.Y. Times, Apr. 24, 2015, https://www.nytimes.com/2015/04/25/world/asia/cia-qaeda-drone-strikes-warren-weinstein-giovanni-lo-porto-deaths.html?_r=0.

### B. PLAINTIFFS PLEAD A PLAUSIBLE INJURY AND HAVE CONSTITUTIONAL STANDING

Plaintiffs allege that because they have been added to the kill list, they are at risk for being killed.  The government takes issue with this logic and contends that they cannot show that the defendants are "actively" trying to kill Zaidan or that, despite the five strikes on Kareem, that he faces "any threat of similar future injury."  This misconstrues the standard to be applied to the injury required for constitutional standing.  The target of lethal action is not required to ascertain how or exactly when the government will actually take such steps.  Being placed on the kill list—which exists for the purpose of taking lethal action—more than adequately establishes an increased risk of death and enough of a probability that such injury will occur if relief is not granted here.

"To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."  *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).  In this Circuit, allegations of future injury satisfy this threshold when the challenged conduct increases the risk of the threatened injury and there is a substantial probability that the harm will occur.  *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006).  "[T]he proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm—such as death, physical injury, or property damage . . . —as the concrete and particularized injury and then to determine whether the increased risk of such harm" is sufficiently imminent.  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015) (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1298 (D.C. Cir. 2007)).  Showing a "substantial probability of injury" establishes imminence for standing purposes.  *Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Chamber of Commerce*

*of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)).   The greater the injury potentially caused by government action, the lesser the increment of probability required to establish standing.   *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) (finding constitutional standing where government action increased potential for destruction of forest by wildfire).   As evident from the case of Anwar al-Aulaqi, whose father came before this Court seeking relief for his son on allegations that the U.S. government believed him to be a terrorist and put him on the kill list, there is a strong correlation between allegations of being on a kill list and actually being killed.   *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 9 (D.D.C. 2010) (denying standing to father seeking relief for son Anwar al-Aulaqi who was on the kill list); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014) (examining tort claims brought after al-Aulaqi was killed by a drone strike).   Notably, in *al-Aulaqi v. Obama*, this Court was not concerned about the inability to plead when al-Aulaqi would be killed.   Naturally, no one can be expected to plead the details of an anticipated covert operation.

Defendants apparently would have Zaidan suffer a strike, or Kareem survive a sixth, in order to establish a more plausible claim for injury.   This is wrong as a matter of law and common sense.   A plaintiff asserting a threat of future injury is not required to expose himself to harm before bringing suit to challenge the enforcement of the law comprising the basis for the threat. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (plaintiffs are not required to await injury from unconstitutional statute or government prosecution to have standing).   In *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010), plaintiffs sought to challenge the application of anti-terrorism laws and their likely prosecution if they continued to provide humanitarian aid to organizations which they believed the government improperly concluded were involved in terrorism.   The Court ruled that they did not have to wait and test the

government's willingness to prosecute them, noting that the government did not argue that plaintiffs would not be prosecuted.  *Id*. at 16.  Likewise here, the government challenges plaintiffs' standing to bring a claim relating to their improper inclusion on the kill list, but refuses to actually represent that they are not being targeted for lethal action, as requested in their January 20, 2017 letter to President Trump.  Compl. ¶ 5.

Although plaintiffs' factual allegations easily clear the bar of plausibility, it is worth noting that the threshold for plausibility of injury is considerably lower at the pleading stage, where "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).  In *Lujan*, the Court ruled that nature lovers who were concerned that a development project would further endanger animal species that they intended to visit in the future lacked standing for lack of probable injury when depositions revealed that they had no travel plans to the affected sites.  *Id*. at 564.  However, in an opinion issued just a few days after *Lujan*, the Court found that a plaintiff had adequately alleged injury in fact where an Act barred him from building on his beachfront property, even though he had no concrete plans to build. The Court explained that there was no inconsistency between this ruling and *Lujan*, because "had the same challenge to a generalized allegation of injury in fact been made at the pleading stage [in *Lujan*], it would have been unsuccessful."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 n.3 (1992).

Even where injury is not an inevitability, when the suit is challenging the legality or illegality of a government action, if "the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury."  *Lujan*, 504 U.S. at

561-62.  Where, for instance, a plaintiff who lives next to proposed construction of a federally licensed dam, he has standing to challenge it even though "he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."  *Id.* at 573 n.7.  Here, plaintiffs plead that they specifically have been selected for lethal action by defendants—there is no more extreme example of a person being the subject of an administrative action.  Accordingly, plaintiffs allege a constitutionally sufficient injury.[7]

## C.  PLAINTIFFS' APA CLAIMS ARE NOT FORECLOSED BY THE POLITICAL QUESTION DOCTRINE

The government attempts to preclude review of the complaint by sweeping it under the political question doctrine.  As demonstrated below, that doctrine does not preclude review of this case, and none of the cases cited by the government support that conclusion.  The Court has jurisdiction to review plaintiffs' claims and the procedures purportedly undertaken by defendants in making the determination to place plaintiffs on the kill list.  This holds true for Kareem, a U.S. citizen bringing Fourth and Fifth Amendment claims, but also for Zaidan, who, while not a U.S. citizen, is equally entitled to seek review of defendants' action under the APA.  The courts are practiced in statutory interpretation and review of Executive action, even where those actions touch on foreign policy.  Nothing asked of the Court here requires it to tread beyond the familiar judicial exercise of examining agency action for compliance with well-established law, provision of appropriate due process, and adherence to applicable regulations.

---

[7] Plaintiffs have moreover suffered professional injury.  The threat of strikes has impaired plaintiffs' ability to effectively report.  Compl. ¶ 87.  Additionally, Zaidan was forced to relocate to Qatar to avoid being attacked in Pakistan, where he had been Al Jazeera's Islamabad Bureau Chief.  *Id.* ¶¶ 25, 37.

1.  **The APA Permits Review of Agency Action with Respect to Putting Plaintiffs on the Kill List**

This action is brought pursuant to the Administrative Procedure Act, which provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  The APA's right of review applies to any "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  This Court has jurisdiction over such actions under 28 U.S.C. § 1331.  *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006).

The evaluation of defendants' conduct is not beyond the jurisdiction or expertise of this Court.  Plaintiffs challenge decisions made by U.S. officials within the United States in apparent violation of applicable laws.  Contrary to defendants' suggestion, plaintiffs are not asking the Court to evaluate split-second decisions made by military commanders in the heat of battle.  The determinations made here likely unfolded in a series of agency conference rooms in Washington D.C.  These are agency actions like any other, and there is a strong presumption of reviewability. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 601 (D.C. Cir. 2007) (clear and convincing evidence of congressional intent to make action unreviewable for court to decline jurisdiction); *Mata v. Lynch*, 135 S. Ct. 2150, 2156 (2015) ("[W]hen a federal court has jurisdiction, it also has a 'virtually unflagging obligation . . . to exercise' that authority.").

The Presidential Policy Guidance purports to be "standard operating procedures" for approving direct action against terrorist targets outside the United States and areas of active hostilities.  The PPG sets forth guidelines for determining how and when to target someone for lethal action, and expressly acknowledges that actions taken pursuant to these guidelines are governed by the laws of war and international legal principles.  Among these principles, of

course, is that non-combatants may not be made the object of an attack.  Compl. ¶ 66(d); PPG at 1.  Determining whether agency action was taken pursuant to these guidelines, whether the guidelines provide sufficient process, and then whether such action was in conformance with the applicable laws and agencies' authority, is the very same "familiar judicial exercise" undertaken in every other case in which a plaintiff seeks to "enforce a specific statutory right." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

In addition, the standards to be applied in determining the legality of the defendants' actions are incorporated in statutes familiar to this Court.  For example, the proscription on targeting civilians is codified in 18 U.S.C. § 2441's multiple prohibitions on harming, murdering or maiming civilians in violation of the laws of war; in 18 U.S.C. § 956's bar on conspiring to murder persons abroad; and Executive Order 12,333, § 2.11 forbidding government employees from conspiring to engage in assassination.  The International Covenant on Political and Civil Rights, which has been ratified by the United States, also proscribes the arbitrary deprivation of a person's inherent right to life.  Common Article 3 of the Geneva Conventions, recognized as a binding part of the law of war in *Hamdan v. Rumsfeld*, 548 U.S. 557, 629-30 (2006), prohibits "violence to life and person, in particular murder of all kinds" against anyone taking no part in active hostilities.  Geneva Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.

This is true with even greater force where, as here, there are constitutional questions involved.  Both plaintiffs assert that the targeting of journalists violates the First Amendment. This Court has ruled that plaintiffs alleging agency action amounting to unlawful viewpoint discrimination is reviewable, and they are entitled to be evaluated by standards that do not punish them for their First Amendment activities.  *Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 60 (D.D.C.

2014), *aff'd sub nom. Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015).  Additionally, Kareem asserts that he was unlawfully deprived of due process and the right to be free from unlawful seizure under the Fourth and Fifth Amendments.  "The powers granted to the Executive and Congress to wage war and provide for national security does not give them *carte blanche* to deprive a U.S. citizen of his life without due process and without any judicial review."  *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d at 69.  When the estate of Mr. Anwar al-Aulaqi, a U.S. citizen, presented a substantive due process claim alleging that defendants killed him "with deliberate indifference to his constitutional right to life, both outside of armed conflict and at a time when he did not present a concrete, specific, and imminent threat to the United States," this Court ruled that the complaint stated a plausible procedural and substantive due process claim.  *Id.* at 73–74. This determination marked a departure from the Court's prior decision that the political question doctrine barred it from considering whether to enjoin the killing of al-Aulaqi.  In that decision, another member of this Court said "there are no judicially manageable standards by which courts can endeavor to assess the President's interpretation of military intelligence and his resulting decision—based on that intelligence—whether to use military force against a terrorist target overseas."  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 47.  This is no longer the case.  We now know that the procedures to be followed—promulgated in May 2013 and declassified in April 2016—are much more involved than the President merely reviewing a piece of intelligence.  The PPG reflects that determinations for lethal action are made as part of a multi-agency process in which "necessary preconditions for lethal action" must be met.  Compl. ¶ 63.

The Court is well-equipped to assess whether the defendants have followed, or violated, the law in targeting plaintiffs for legal action.  In a similar exercise, courts have long examined whether foreign nationals have properly been designated a "foreign terrorist organization" or

drug trafficker. *E.g., Fares v. Smith*, No. CV 16-1730 (CKK), 2017 WL 1319716, at *2 (D.D.C. Apr. 7, 2017). The D.C. Circuit said that it may constitutionally decide whether the government has followed the proper procedures, whether the organization is foreign, and whether it has engaged in terrorist activity, *but not* whether "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 21–24 (D.C. Cir. 1999). Plaintiffs ask exactly the same narrow inquiries of the Court here. That is, did the defendants properly find plaintiffs to be terrorists or members of terrorist groups, do they fall within the scope of the AUMF, and if not, then does their inclusion on the list of those targeted for lethal action violate the Executive Orders, statutory authority, and treaties cited in the complaint.

### 2. The Government Does Not Have the Discretion to Violate the Law

The Executive does not have unchecked authority to murder any civilian abroad, regardless of whether Congress has issued a grant of authority such as the AUMF, wholly insulated from review for compliance with myriad orders and statutes that expressly forbid exactly that. In *Al Shimari v. CACI Premier Tech., Inc*., the Fourth Circuit declared that "[c]onducting a 'textual, structural, and historical' examination of a statute or treaty 'is what courts do' and typically is not barred by the political question doctrine." 840 F.3d 147, 159 (4th Cir. 2016) (quoting *Zivotofsky*, 566 U.S. at 195, 200). It remanded the case to the district court to determine which of the alleged acts violated settled international and criminal law on the premise that "conduct by CACI employees that was unlawful when committed is justiciable, irrespective [of] whether that conduct occurred under the control of the military." *Al Shimari*, 840 F.3d at 151.

21

The government argues that the APA excludes from its reach "military authority exercised in the field in the time of war or in occupied territory" and so the use of lethal force in Syria is not subject to review.  Mot. at 13 n.4.  This argument does not apply to this complaint, which does not challenge military decisions as to the timing or circumstances of the attacks or even the choice of drones as a weapon.  The decision challenged is not one taken in a field of war or occupied territory by the military, but in a conference room by executive officials here in Washington.  And these are the types of decisions routinely examined by the courts in evaluating claims brought pursuant to the APA.  The government also proclaims that use of military force against a specific target is committed to Executive discretion by law, but that discretion is not entirely unfettered, nor is it unreviewable, particularly in a situation in which the target is being chosen far from the battlefield.  A "state of war is not a blank check;" there is no violation of separation of powers where the court exercises its "own time-honored and constitutionally mandated role" of reviewing procedural claims without getting involved in the strategy or conduct of war.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (plurality).  The cited statutes proscribing the use of force against civilians also render the assertion of unreviewability invalid; courts regularly hear claims involving alleged war crimes.  "Congress, by ratifying the Geneva Conventions and by enacting the War Crimes Act, has defined the international law norm governing war crimes.  This norm is binding, universal, and precisely defined."  *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 588 (E.D. Va. 2009).  Conspiring to use violence against a civilian in violation of 18 U.S.C. §§ 956 and 2441 is like any other crime codified in Title 18, and this court may exercise jurisdiction in reviewing agency actions taken in violation of these laws.

The government then asserts that the APA cannot apply to the President, who is not an agency. Whatever relief the government hopes to obtain from this argument, it is concededly not dispositive, as the President is merely one defendant among 10 agencies and agency officials whose actions are the subject of this complaint. The APA facially applies to administrative agencies, all of which are organized under the executive branch. That the President oversees each agency has no bearing on whether they are proper defendants here. And, even if courts generally will not issue an injunction against the President himself, review of presidential action can be obtained in a suit like this one, which seeks to enjoin agencies from enforcing the President's unlawful directive. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017), as amended (May 31, 2017), as amended (June 15, 2017), cert. granted, No. 16-1436, 2017 WL 2722580 (U.S. June 26, 2017).

Plaintiffs are not asking the Courts to exercise 20/20 hindsight with respect to a military operation and its collateral damage.[8] The government invokes *El-Shifa Pharmaceutical Industries Company v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010), but that case is inapposite. Unlike here, where the question is that of a pre-approved extrajudicial killing of a civilian journalist, the *El-Shifa* plaintiffs failed to establish that the destruction of property was prohibited by a jus cogens norm or a violation of a U.S. statute; instead, their claim amounted to little more than a challenge to the advisability of a logistical targeting decision well within the

---

[8] This case is distinguishable from the D.C. Circuit's recent decision in *bin Ali Jaber v. United States*, No. 16-5093, 2017 WL 2818645 at *4 (D.C. Cir. June 30, 2017), in which the court was asked to declare that what appeared to be a deliberate decision to launch a drone strike likely to and which did kill civilians was "mistaken and not justified." Here plaintiffs request the Court to examine the determination that led to their placement on the kill list, which is more akin to *Hamdi*, 542 U.S. at 536, in which the Court required the Executive to provide due process to alleged enemy combatants, and allow them to challenge the factual basis for action against them, despite the ongoing military conflict. *See also*, *Hamdan*, 548 U.S. 557 (requiring government to comply with Common Article 3 of the Geneva Conventions during war with Al Qaeda).

Executive's purview.  The position that the government urges here would apply the political question doctrine to foreclose judicial oversight of an intent to commit war crimes.  This Court should reject it.

## CONCLUSION

For the reasons set forth above, plaintiffs respectfully request the Court to deny Defendants' Motion to Dismiss.

<div style="margin-left:40%">

/s/ Jeffrey D. Robinson
JEFFREY D. ROBINSON (D.C. Bar #376037)
TARA J. PLOCHOCKI (D.C. Bar #989404)
**LEWIS BAACH KAUFMANN**
**MIDDLEMISS PLLC**
1899 Pennsylvania Ave. NW,
Suite 600
Washington, D.C.  20006
202-833-8900
jeffrey.robinson@lbkmlaw.com
tara.plochocki@lbkmlaw.com

Jennifer Gibson (Cal. Bar #288516)
Reprieve
P.O. Box 72054
London EC3P 3BZ
+44 (0)207 553 8152
jennifer.gibson@reprieve.org.uk

</div>