# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )

**AHMAD MUAFFAQ ZAIDAN**, *et al.*,    )
                                  )

        **Plaintiffs,**          )

                                  )

     **v.**                        )

                                  )     **Civil Action No. 17-581 (RMC)**

**DONALD J. TRUMP,**            )
**President of the United States**, *et al.*,  )

                                  )

        **Defendants.**        )
_____  )

## MEMORANDUM OPINION

Plaintiffs Ahmad Muaffaq Zaidan and Bilal Abdul Kareem are journalists who specialize in reporting on terrorism and conflict in the Middle East. Mr. Zaidan learned his name was included on a list of suspected terrorists and Mr. Kareem has been the victim or near victim of at least five aerial bombings while in Syria. Based on this information, the Plaintiffs believe their names are on a list of individuals the United States has determined are terrorists and may be killed (the so-called Kill List). Plaintiffs sue President Donald J. Trump, the Director of the Central Intelligence Agency (CIA), the Secretary of the Department of Defense (DOD), the Secretary of the Department of Homeland Security (DHS), the Attorney General, and the Director of National Intelligence (DNI), all in their official capacities, as well as the Department of Justice (DOJ), DOD, DHS, and CIA. Plaintiffs allege that these officials and agencies violated the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.*, by putting Plaintiffs' names on the Kill List. Defendants move to dismiss for lack of subject-matter jurisdiction, arguing that Plaintiffs lack standing and raise a political question outside the jurisdiction of the courts. Defendants also move to dismiss for failure to state a claim upon which relief may be granted. The Court will grant the Motion to Dismiss in part and deny it in part.

## I.  BACKGROUND

The Court takes its facts from the Complaint which the government, at this early stage of the litigation, has not controverted.  Mr. Zaidan is a Syrian and Pakistani citizen who has been employed as a journalist by Al Jazeera for over 20 years.  Compl. [Dkt. 1] ¶ 3.  Mr. Kareem is an American citizen and freelance journalist, reporting for BBC, Channel 4 in the United Kingdom, CNN, Sky News, and Al Jazeera.  *Id*. ¶ 4.  Both Mr. Zaidan and Mr. Kareem regularly investigate and report on terrorism and its causes in the Middle East.  *Id*. ¶¶ 3-4.

As part of his reporting, Mr. Zaidan was one of only two journalists who interviewed Osama bin Laden prior to the attacks on September 11, 2001.  *Id*. ¶ 3.  Mr. Zaidan was not involved in planning the 9/11 attack or any other attack.  *Id*. ¶¶ 20-21.  He has no association with Al-Qaeda or the Taliban and poses no threat to the United States or its citizens.  *Id*. ¶¶ 22-23.  Mr. Zaidan's work does, however, require him to communicate frequently "with sources who have connections [to] terrorists and their associates" and to travel in countries where terrorists are active.  *Id*. ¶ 26.  In addition to bin Laden, Mr. Zaidan has interviewed other terrorist leaders such as Baitullah Mehsud of the Tehreek-e Taliban-e Pakistan (Taliban Movement of Pakistan) and Abu Mohammad al-Jolani of the Al Nusra Front.  *Id*. ¶¶ 30-31.  In 2015, Mr. Zaidan traveled in Syria reporting on battles of the Free Syrian Army; as a result, he says that he was listed on Syrian State Television as a member of Al-Qaeda.  *Id*. ¶ 32.  Mr. Zaidan alleges on information and belief that his actions as a journalist caused him to be listed in a U.S. intelligence document called SKYNET, which identified potential terrorists based on their metadata (electronic patterns of communications, writings, social media postings, and travel).  *Id*. ¶ 33.  He believes that because he was identified by SKYNET as a potential terrorist, he has also been included on the Kill List, allowing him to be targeted and killed.  *Id*. ¶ 35.

Similarly, Mr. Kareem has no association with Al-Qaeda or the Taliban, has never participated in the planning of a terrorist attack, and has never aided any organization or individual which engages in terrorism. *Id*. ¶¶ 40-42. He is currently employed by On the Ground Network (OGN) and tasked with investigative journalistic coverage of the anti-Assad rebels in Syria. *Id*. ¶ 45. This work involves interactions with "local 'militants' during interviews." *Id*. In June 2016, Mr. Kareem was at the location of four different aerial attacks. *Id*. ¶¶ 47-50. The first and fourth incidents involved strikes to the OGN office in Idlib City when Mr. Kareem was inside the office. *Id*. ¶¶ 47, 50. The second attack occurred in the town of Hariyataan while Mr. Kareem was there conducting an interview. *Id*. ¶ 48. The strike hit the exact location where Mr. Kareem was setting up for the interview, but at the time of the strike he had climbed a nearby hill to "view destroyed homes a street away." *Id*. The third attack occurred when the vehicle in which Mr. Kareem and his staff were traveling was "struck and destroyed by a drone-launched Hellfire missile." *Id*. ¶ 49. At the time of the strike, Mr. Kareem was sitting in a different, nearby vehicle which was "hurled into the air by the force of the blast" and "flipped upside down." *Id*. In August 2016, Mr. Kareem was again the victim of an attack when he was at the Kulliyatul Midfaʿiyyah (Artillery College) to film. *Id*. ¶ 51. He and his coworkers were in his car "when there was a huge blast only yards away from the car." *Id*. The occupants survived, but all were hit by shrapnel from the blast. *Id*. As a result of these five near-miss experiences in a three-month period, Mr. Kareem alleges upon information and belief that he was the target and that his name is included on the United States Kill List. *Id*. ¶ 52.

According to the Complaint, the United States has publically disclosed that it "conducts lethal strikes targeted at individuals, using remotely piloted aircraft, among other weapons, and that targets are selected . . . as a result of a 'process' in which targets are

nominated by one or more defendants, and their inclusion on the Kill List is confirmed through a series of meetings and discussions among defendants." *Id.* ¶ 55. Then-President Barack H. Obama issued the Presidential Policy Guidance on May 22, 2013, which delineated guidelines and provided for oversight and accountability in the process of designating individuals for the Kill List. *Id.* ¶ 57; *see also* Procedures for Approving Direct Action Against Terrorist Targets Located Outside the United States and Areas of Active Hostilities (May 22, 2013), https://www.aclu.org/sites/default/files/field_document/presidential_policy_guidance.pdf (Presidential Policy Guidance). On August 6, 2016, the Presidential Policy Guidance was made public. *Id.* ¶ 58. It includes guidance on designating individuals based only on metadata (or without knowing their identities), as well as the "necessary preconditions for taking lethal action." *Id.* ¶¶ 61, 63.

Plaintiffs allege that Defendants violated the APA when Defendants added Plaintiffs' names to the so-called Kill List because Plaintiffs do not meet the preconditions listed in the Presidential Policy Guidance. *Id.* ¶ 64. Plaintiffs also challenge the lack of notice and opportunity to refute their inclusion on the Kill List. *Id.* ¶ 65. The Complaint advances six counts under the APA:

> Count One: Inclusion of Plaintiffs on the Kill List was arbitrary, capricious and an abuse of discretion.
>
> Count Two: Inclusion of Plaintiffs on the Kill List was not in accord with law because it (1) "violates the prohibition on conspiring to or assassinating any person abroad contained in Executive Order 12,333"; (2) "violates the prohibition against war crimes contained in 18 U.S.C. § 2441 because it constitutes a grave breach of common article 3 of the Geneva Conventions as specified in 18 U.S.C. § 2441(c)(3)"; (3) "violates Article 6 of the International Covenant on Civil and Political Rights"; and (4) "violates 18 U.S.C. § 956(a)(1)."
>
> Count Three: Inclusion of Plaintiffs on the Kill List exceeded Defendants' statutory authority "because it exceeds the authority

given to the Executive pursuant to the Authorization for the Use of Military Force."

Count Four:  Inclusion of Plaintiffs on the Kill List violated due process because Plaintiffs were provided no notice and given no opportunity to challenge their inclusion.

Count Five:  Inclusion of Plaintiffs on the Kill List violated the First Amendment because it "has the effect of restricting and inhibiting their exercise of free speech and their ability to function as journalists entitled to freedom of the press."

Count Six (only as to Mr. Kareem):  Inclusion of Plaintiff on the Kill List violated the Fourth and Fifth Amendments because it constituted an illegal seizure and "seeks to deprive [Mr. Kareem] of life without due process of law."

*Id.* ¶¶ 70, 72-76, 78, 82-83, 85, 90-91.  In the present posture of the case, the Court must accept all plausible factual allegations in the Complaint as true.  *See Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).

On June 5, 2017, Defendants moved to dismiss.  Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss (Mot.) [Dkt. 8-1].  Plaintiffs opposed.  Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (Opp'n) [Dkt. 10].  Defendants replied.  Defs.' Reply Mem. in Supp. of Their Mot. to Dismiss (Reply) [Dkt. 11].  The Court heard oral argument on May 1, 2018.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss – Fed. R. Civ. P. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  No action of the parties can confer subject-matter jurisdiction on a federal court because subject-matter jurisdiction is both a statutory requirement and an Article III requirement.  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject-matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr*

*v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction").

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Barr*, 370 F.3d at 1199. Nevertheless, "the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006). A court may consider materials outside the pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In such circumstances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

**B. Motion to Dismiss – Fed. R. Civ. P. 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need to include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. A court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.

## III.  ANALYSIS

Defendants provide three alternative arguments to support their motion to dismiss. First, they argue the Court lacks subject-matter jurisdiction "because Plaintiffs have not alleged sufficient facts to establish that they have standing to bring their lawsuit." Mot. at 1. Second, they argue that the Court lacks subject-matter jurisdiction because Plaintiffs raise a political question that would require the Court "to probe into sensitive and complex national security decisions." *Id.* at 2. Finally, they move to dismiss under Rule 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief may be granted because they "have not pled sufficient facts to establish that the alleged unlawful actions have even occurred." *Id.* The Court will address each argument in turn.

## A. Subject-Matter Jurisdiction

### 1. Standing

Standing is part and parcel of Article III's limitation on the judicial power of the federal courts, which extends only to cases or controversies. U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority [and] to Controversies . . . ."); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015). The strictures of Article III standing are by now "familiar." *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013). Standing requires (1) the plaintiff to have suffered an injury in fact that is both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) the injury must be traceable to the defendants' actions; and (3) the injury must be redressable by a favorable decision of the court. *See id.* at 2685-86 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992)).

A federal court must assure itself of both constitutional and statutory subject-matter jurisdiction. The former obtains if the case is one "arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2. The relevant statute, 28 U.S.C. § 1331, likewise confers jurisdiction upon lower courts to hear "all civil actions arising under the Constitution, laws, or treaties of the United States." Federal courts have constitutional and statutory "arising under" jurisdiction whenever a plaintiff's claim "will be sustained if the Constitution is given one construction and will be defeated if it is given another." *Powell v. McCormack*, 395 U.S. 486, 514-16 (1969) (citing *Bell v. Hood*, 327 U.S. 678, 685 (1946); *King Cnty. v. Seattle Sch. Dist. No. 1*, 263 U.S. 361, 363-64 (1923)).

a. Injury-in-fact

A plaintiff must allege an injury-in-fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *See Windsor*, 133 S. Ct. at 2685 (citing *Lujan*, 504 U.S. at 559-62). Allegations of speculative or possible future injury do not satisfy the requirements of Article III. "A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

When an alleged injury has not yet occurred, courts must determine whether it is imminent. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). An injury is imminent if the threatened injury is "certainly impending" or if there is substantial risk that the harm will occur. *Id*. "[P]laintiffs bear the burden of pleading . . . concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court." *Id*. at 414 n.5 (internal quotations and citation omitted).

Defendants argue that both Plaintiffs fail to meet the "injury-in-fact" prerequisite for standing because none of the factual allegations demonstrates that they have suffered harm or that there is a substantial risk of future harm. Defendants contend that none of Plaintiffs' allegations—the inclusion of Mr. Zaidan's name on SKYNET or Mr. Kareem's repeated near-miss incidents—indicates that either Plaintiff is actually on the Kill List, which Defendants appear to concede would itself constitute harm or demonstrate a substantial risk of future harm. *See* Mot. at 3-11.

i. Mr. Zaidan lacks standing to sue.

Mr. Zaidan asserts, upon information and belief, that his name is on the Kill List because of the nature of his metadata, that is (1) as part of his job as a journalist he

communicates frequently with individuals who have connections to terrorists, (2) his social media accounts contain words and phrases associated with terrorism, and (3) he has interviewed leaders of al-Qaeda and the Taliban and other terrorist organizations, which caused him to be identified as a potential target by SKYNET, an allegedly

classified U.S. intelligence document. Compl. ¶¶ 26-34.

Defendants argue that Mr. Zaidan cannot rely on a purportedly classified document (SKYNET), despite its availability in the public domain on the Internet. They cite *Alfred A. Knopf, Inc. v. Colby* for this proposition. 509 F.2d 1362, 1370 (4th Cir. 1975), *cert. denied*, 421 U.S. 992 (1975). Defendants over-read *Knopf*, a case in which former government employees challenged deletions required by the CIA of information in their proposed book. *See id*. at 1365. *Knopf* evaluated the impact of the then-newly adopted Freedom of Information Act (FOIA), 5 U.S.C. § 552, on *EPA v. Mink*, 410 U.S. 73 (1972), which had held that "executive decisions respecting the classifying of information are not subject to judicial review." *Knopf*, 509 F.2d at 1367. "The legislative history [of FOIA] makes it clear that the Congress intended to overthrow the result of *Mink*." *Id*. In that context, the Fourth Circuit reversed the District Court for having imposed too high a burden on the government to prove the classified status of the deleted materials. *Id*. at 1370. It then held that "individuals bound by the secrecy agreements [as part of their government employment] may not disclose information, still classified, learned by them during their employments regardless of what they may learn or might learn thereafter." *Id*. at 1371. *Knopf* further held that such secrecy obligations continue as to classified information even if revealed by a non-official source after the person's government employment has ended. *Id*. Defendants do not suggest that Mr. Zaidan learned of SKYNET as part of employment with the United States government or that he is, therefore, prohibited from disclosing any information

concerning it.  To the contrary, Mr. Zaidan alleges that some information from SKYNET was publicized by unknown persons on the Internet and it included his name as prime among persons whose metadata caused them to be suspected of terrorist activities.  That information, whether or not classified, may be cited by Plaintiffs although its weight may be subject to attack.

The Complaint alleges that "Defendants' false classification of plaintiff Zaidan as a terrorist, based on SKYNET's metadata analysis, has prompted defendants to place him on their Kill List and target him to be killed."  Compl. ¶ 35.  Defendants insist that even if Mr. Zaidan's name is on a SKYNET list of "potential terrorists," he has failed to allege adequately a link between SKYNET and the Kill List.  This point is well taken.  When reviewing a motion to dismiss, a court must assume that all plausible factual allegations are true; nonetheless, the alleged injury cannot be "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Therefore, the Court assumes the accuracy of Mr. Zaidan's allegations that he is a journalist who regularly meets with individuals tied to terrorists, that he has interviewed terrorist leaders, and that he found his name on a SKYNET list of potential terrorists.  These facts, however, are not sufficient to allege plausibly that his name is on a U.S. Kill List; that conclusion is mere speculation presented as a fact.  As did the plaintiffs in *Clapper v. Amnesty International USA*, Mr. Zaidan presents a list of factual allegations that is too attenuated from the final necessary allegation.  568 U.S. at 410-11.  In other words, while Mr. Zaidan would not need to plead with certainty or have actual proof that his name is on a Kill List, his current allegations would require the Court to find that it is plausible that every individual whose name is on the SKYNET list of potential terrorists is also on a Kill List, for which there is no evidence of fact or logic.  To the contrary, Mr. Zaidan does not allege that a single individual

on the SKYNET list has been the subject of a United States drone strike or targeted for lethal action. While it is possible that there is a correlation between a list like SKYNET and the Kill List, the Court finds no allegations in the Complaint that raise that possibility above mere speculation. Accordingly, the Court finds Mr. Zaidan has failed to allege a plausible injury-in-fact and therefore has no standing to sue.[1] Because the Court concludes that Mr. Zaidan has no standing to pursue his lawsuit, the remaining arguments will be analyzed only as they pertain to Mr. Kareem.

### ii. Mr. Kareem has demonstrated standing.

Mr. Kareem alleges that he is on the Kill List because he was the victim of five near-miss attacks within a three-month period in 2016. Two of the attacks involved his place of work, one involved his own vehicle, one involved a work vehicle in which he had been traveling immediately before, and one hit a location from which he had just walked away. *See* Compl. ¶¶ 46-51. Defendants argue that Mr. Kareem was on "battlefields in Syria" and that he merely alleges "he has sustained or narrowly escaped war-related injuries." Mot. at 8. Even assuming the facts of the attacks are true, Defendants argue that Mr. Kareem has provided no reason to believe they are "attributable to anything more than a journalist reporting from a dangerous and active battlefield." *Id.* Defendants ask the Court to consider independent sources which conclude that Syria is a volatile place where forces from multiple countries and groups engage in

---

[1] The Opposition argues that a "disposition matrix" reported by the *Washington Post* indicates that an individual's inclusion on the SKYNET list could lead to results other than death, such as capture and interrogation or rendition. Opp'n at 11 n.4. The news article constitutes inadmissible hearsay and cannot be relied upon in analyzing Mr. Zaidan's injury. The Complaint does not allege or challenge Mr. Zaidan's inclusion on a list of potential terrorists that the United States seeks to capture but only inclusion on the Kill List.

hostilities and attacks, making implausible Mr. Kareem's allegations that the attacks he suffered were at the hands of the United States and not other combatants.

Mr. Kareem alleges that the United States engages in targeted drone strikes,[2] that he has been the near victim of a military strike on five occasions (at least one of which included the use of a drone), and that he is a journalist who is often in contact with rebel or terrorist organizations. Compl. ¶¶ 44-52, 55-59. Accepting all well-pled allegations as true, Mr. Kareem has plausibly alleged that he was in 2016 a target on the Kill List with evidence that makes it "more than a sheer possibility." *Iqbal*, 556 U.S. at 678. Although Defendants set forth other plausible alternatives, such as the fact that Mr. Kareem could have been targeted by Syria for reporting on anti-Assad efforts, their argument does not make it implausible that the attacks were a result of U.S. action; at oral argument, Defendants conceded that Mr. Kareem specifies that at least one of the strikes was from a Hellfire missile of the kind used by the U.S. without identifying the other weapons to the contrary. The Court concludes that Mr. Kareem has adequately pled injury-in-fact.[3]

### b. Causation

Causation is the second element of standing and is just as critical as injury-in-fact. Causation requires "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The harm alleged must be "fairly traceable to the challenged action of

---

[2] *See, e.g., Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010).

[3] Since the Complaint alleges that Mr. Kareem was on the U.S. Kill List in 2016 but was not killed, it posits that his danger continues to the present time. Having filed a motion to dismiss based solely on legal arguments, the government makes no factual argument to the contrary.

the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Defendants do not directly rebut Mr. Kareem's allegations of causation, but do argue that "the more plausible explanation" for Mr. Kareem's narrow escapes from injury in five different strikes "is that he has chosen to work as a journalist in a country rife with violence and warfare." Reply at 8. *Twombly* and *Iqbal* do not, however, require a plaintiff to allege the *most* plausible set of facts, but merely *a* plausible set of facts. *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). While it is plausible that Mr. Kareem is not being targeted by the United States, it is also plausible that Mr. Kareem's multiple near-miss incidents were caused by Defendants' decision to include him on the Kill List and were, therefore, caused by Defendants' actions. Probability is not the standard on a motion to dismiss.

### c. Redressability

The last element of standing is redressability, requiring that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotations and citation omitted); *see also In re Sci. Applications Int'l Corp. (SAIC) Backup Take Data Theft Litig.*, 45 F. Supp. 3d 14, 33 (D.D.C. 2014). Defendants make no arguments regarding redressability and thus the matter is conceded. The Court finds that if Mr. Kareem succeeds in this case his injury can be redressed through an injunction or order from this Court requiring, at the least, that the United States review and consider his evidence before it directs lethal force against him.

2. *Sovereign Immunity*

There must be a valid waiver of the United States' sovereign immunity for Mr. Kareem to bring claims against an agency of the United States through its officials, as he does here. *See, e.g.*, *Block v. North Dakota*, 461 U.S. 273, 287 (1983) ("The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress."). Naming the heads of agencies as defendants in their official capacities results in a lawsuit against the United States. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978))). The principles of sovereign immunity apply equally to federal agencies, officers, and employees acting in their official capacities. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). The United States' exemption from suit is expressed in jurisdictional terms—that is, federal courts lack subject-matter jurisdiction over suits against the United States in the absence of a clear waiver of sovereign immunity. *See, e.g.*, *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006) ("[A] plaintiff must overcome the defense of sovereign immunity in order to establish the jurisdiction necessary to survive a Rule 12(b)(1) motion to dismiss."). Statutes that waive sovereign immunity are strictly construed and any doubt or ambiguity is resolved in favor of immunity. *Lane v. Pena*, 518 U.S. 187, 192 (1996).

The Complaint advances multiple claims by Mr. Kareem based on the APA. That statute waives the government's sovereign immunity from suit for individuals "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute."  5 U.S.C. § 702 ("The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.").  APA review is precluded if an applicable statute bars judicial review, if the "agency action is committed to agency discretion by law," or if the entity sued is exempt from the APA's definition of agency in § 701(b)(1).  *Id*. § 701(a), (b)(1).

To begin, the Court will dismiss all claims against President Trump because the President is not an agency within the meaning of the APA.  *See Dalton v. Specter*, 511 U.S. 462, 467-68 (1994) ("[T]he APA does not apply to the President."); *Franklin v. Massachusetts*, 505 U.S. 788, 796-801 (1992).

Defendants argue that all of Mr. Kareem's claims must be dismissed because "military authority exercised in the field in time of war or in occupied territory" is exempt from the definition of agency action in the APA.  5 U.S.C. § 701(b)(1)(G).  These arguments may prove applicable, but Defendants fail to demonstrate at this point that the challenged action took place "in the field in time of war."

The action at issue is the alleged decision of the United States to place Mr. Kareem on the Kill List.  The Complaint alleges that this decision was made in the manner dictated by the Presidential Policy Guidance, whereby it was discussed, debated, and decided in Washington, D.C.  Thus, while execution of such a decision would be an exercise of military authority in the field, the Complaint plausibly argues that the decision itself was made by authorities who were not "in the field" as required for the APA exemption to apply.

Further, Defendants fail to identify the war in which the United States is or was engaged and relegate the argument to a single sentence in a footnote.  Somewhat contrary to this semi-argument, Defendants also repeatedly argue in brief and at oral argument that the conflict

in Syria is an internal civil war among Syrians, in which the United States merely provides military assistance. *See* Mot. at 9. From the former perspective, Defendants insist that the APA does not apply due to this "time of war," while from the latter, Defendants assert that the United States has such a limited military presence in Syria it is not plausible the attacks against Mr. Kareem were the result of U.S. action. Of course, a non-traditional war can be a "time of war" exempt from APA coverage, but Defendants fail to identify the war at issue. *See Anderson v. Carter*, 802 F.3d 4, 8-9 (D.C. Cir. 2015) (finding that "hostilities may subsist between two nations on a limited basis, which would [once] be properly termed [an] imperfect war" and is now called an "undeclared war"); *Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 129 (D.D.C. 2003) (finding judicial review permissible of order that military submit to anthrax vaccine because, in part, "the order . . . was given by the Secretary of Defense, not by commanders in the field"); *Jaffee v. United States*, 592 F.2d 712, 719-20 (3d Cir. 1979) (questioning whether actions taken in the United States during the Korean War could be considered "in the field"); *Rosner v. United States*, 231 F. Supp. 2d 1202, 1217-18 (S.D. Fla. 2002) (allowing discovery on whether APA's exception of "military authority" from court review applied to the Army's seizure of property expropriated by the Hungarian government during World War II). The Court does not close its eyes to the fact that the U.S. military is engaged in warfare in Syria and elsewhere, but Defendants fail to use such terms. This may seem like a foolish requirement under the circumstances, but it pertains by statute nonetheless.

The undeveloped facts and legal arguments presented by Defendants are insufficient to prompt dismissal of Mr. Kareem's Complaint. Defendants do not disavow the Presidential Policy Guidance or its applicability to any decision in 2016 or earlier to put Mr. Kareem's name on the Kill List, as he alleges. The Presidential Policy Guidance supports his

argument that the relevant decisions are made far from the field of battle. Mr. Kareem complains of an alleged decision to authorize a lethal strike against him and not a decision in the field to attempt to carry out that authorization. He wants the opportunity to persuade his government that he is not a terrorist or a threat so that the alleged authorization to kill is rescinded. This legal approach to resolving the issue has previously been recommended by this District Court and sustained on appeal. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (*en banc*); *bin Ali Jaber v. United States*, 861 F.3d 241, 246 (D.C. Cir. 2017).

### 3. Political Question

Finally, Defendants urge the Court to find that there is no judicial role here because Mr. Kareem's Complaint raises a political question for which the Judiciary is ill-equipped to rule. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).

However, "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and the political question doctrine's "shifting contours and uncertain underpinnings" make it "susceptible to indiscriminate and overbroad application to claims properly before the federal courts," *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C. Cir. 1984) (*en banc*), *vacated on other grounds*, 471 U.S. 1113 (1985). "The political question doctrine has occupied a more limited place in the Supreme Court's jurisprudence than is sometimes assumed. The Court has relied on

the doctrine only twice in the last 50 years." *El-Shifa*, 607 F.3d at 856 (Kavanaugh, J., concurring in judgment).

When evaluating whether an issue involves a political question, courts consider a number of factors; the presence of one such factor is sufficient to find a political question. *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). A court considers whether the case presents:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. The government focuses on the first two *Baker* factors and argues that the decision of whether to target an individual for lethal action is a wartime decision that is committed to the executive with no judicially manageable standard for review. Mr. Kareem argues that this case is most similar to *People's Mojahedin Organization v. Department of State*, 182 F.3d 17 (D.C. Cir. 1999), which concerned a challenge to the State Department's identification of the People's Mojahedin Organization as a terrorist organization. The D.C. Circuit found that the question was subject to judicial review because the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 8 U.S.C. § 1189, specified the standards to apply. *Id.* at 113. Mr. Kareem urges the Court to find that it can evaluate the decision to include Mr. Kareem on the Kill List just as courts evaluate a decision to label an organization as a terrorist organization under AEDPA.

Judges on this Court have struggled before with these issues in analogous contexts. Judge John Bates decided that Nasser al-Aulaqi, father of terrorist Anwar al-Aulaqi, did not have standing to sue the United States to prevent it from targeting his son with a drone strike. *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) (*al-Aulaqi I*). In discussing the difficulty of the issues, Judge Bates asked: "How is it that judicial approval is required when the United States decides to target a U.S. citizen overseas for electronic surveillance, but that, according to defendants, judicial scrutiny is prohibited when the United States decides to target a U.S. citizen overseas for death?" *Id.* at 8. Nonetheless, he agreed that "[t]he difficulty that U.S. courts would encounter if they were tasked with 'ascertaining the "facts" of military decisions exercised thousands of miles from the forum, lies at the heart of the determination whether the question posed is a "political" one.'" *Id.* at 45 (quoting *DaCosta v. Laird*, 471 F.2d 1146, 1148 (2d Cir. 1973)). Judge Bates then concluded, with some discomfiture, "that there are circumstances in which the Executive's unilateral decision to kill a U.S. citizen overseas" is "judicially unreviewable." *Id.* at 51. Finding such a circumstance presented in that case, Judge Bates dismissed Nasser al-Aulaqi's suit.

After "the United States intentionally targeted and killed [Anwar al-Aulaqi] with a drone strike in Yemen on September 30, 2011," "[b]ecause [he] was a terrorist leader of al Qa'ida in the Arabian Peninsula," Nasser al-Aulaqi sued various U.S. persons, under a *Bivens* theory of liability, in a separate case before this Judge. *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 58 (D.D.C. 2014) (*al-Aulaqi II*); *see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971). "It was al-Aulaqi's actions—and, in particular, his direct personal involvement in the continued planning and execution of terrorist attacks against the U.S. homeland—that led the United States to take action." *Al-Aulaqi II*, 35 F. Supp. 3d at 64

(citing a letter from then-Attorney General Holder) (internal citation omitted).  The question presented was whether "federal officials can be held personally liable for their roles in drone strikes abroad that target and kill U.S. citizens.  The question raise[d] fundamental issues regarding constitutional principles." *Id*. at 58.  The Court in *al-Aulaqi II* found Nasser al-Aulaqi's second case to be justiciable "[b]ecause Plaintiffs . . . pointedly allege[d] that Defendants, U.S. officials, intentionally targeted and killed U.S. citizens abroad without due process . . . ." *Id*. at 70.  *Al-Aulaqi II* was ultimately dismissed after the undersigned declined to extend *Bivens* into new territory.

Neither of the *al-Aulaqi* cases bears directly on the instant Complaint.  Judge Bates read the complaint in *al-Aulaqi I* as asking him to determine the facts and judge the legitimacy of military decisions made thousands of miles away, which is not the case here.  *Al-Aulaqi II* is similarly distinguishable because Nasser al-Aulaqi attempted to extend *Bivens*—allowing challenges to federal actors on constitutional grounds—beyond its grasp.  It remains a truism that judges are not good judges of military decisions during war.  The immediate Complaint asks for no such non-judicial feat; rather, it alleges that placement on the Kill List occurs only after nomination by a defense agency principal and agreement by other such principals, with prior notice to the President.  The persons alleged to have exercised this authority are alleged to have followed a known procedure that occurred in Washington or its environs.

With this combination of precedents in mind, the Court will evaluate each Count to determine if it presents a political question that is not for judicial review.

a.  Count One – Agency action was arbitrary and capricious, and an abuse of discretion

Count One asks the Court to examine whether the defense agencies allegedly involved in the decision to place Mr. Kareem on the Kill List complied with the process set out in Section Three of the Presidential Policy Guidance:  the "policy standard and procedure for designating identified HVTs [high value targets] for lethal action."  Presidential Policy Guidance at 11.  The Court finds that the Presidential Policy Guidance fails to provide a judicially manageable standard.

AEDPA, on which *People's Mojahedin* rested, requires a series of formal findings that an organization meets certain criteria before it can be labeled an international terrorist organization:  "(A) the organization is a foreign organization"; "(B) the organization engages in terrorist activity" as defined in AEDPA; and "(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1).  In direct contrast, the Presidential Policy Guidance provides no test or standard that must be satisfied before the government may add an individual (known or unknown) to the Kill List; it only specifies the steps and processes that the relevant defense agencies must complete.  *See* Presidential Policy Guidance at 11-14.  When an individual who is not a U.S. person is proposed for lethal action, and the principals of the relevant defense agencies unanimously decide that lethal action should be taken, the principal of the nominating agency may approve lethal action after prior notice to the President.  *Id*. at 14 § 3.E.1.  When a known U.S. person is proposed for lethal action, such as a U.S. citizen overseas, the defense agencies make a recommendation but it is the President who ultimately decides whether to target that U.S. person for lethal action.  *See id*. at 14 § 3.E.  In neither decision-making process is the decision-maker required to make preliminary findings or follow a specific process.

The analogy between AEDPA and the Presidential Policy Guidance is too imperfect for case law on the former to support a conclusion here that the Presidential Policy Guidance provides requisite standards for judicial review. As an emphasis to this conclusion, the Presidential Policy Guidance itself states that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Presidential Policy Guidance at 18 § 8.A. AEDPA, however, specifically provides a reviewable right to challenge an organization's designation as a terrorist organization. *See* 8 U.S.C. § 1189(c)(1) ("Not later than 30 days after publication in the Federal Register of a designation, an amended designation, or a determination in response to a petition for revocation, the designated organization may seek judicial review in the United States Court of Appeals for the District of Columbia Circuit.").

Whether Defendants complied with the Presidential Policy Guidance is a political question the Court must refrain from addressing. Count One will be dismissed.

b. Counts Two and Three – Agency action was not in accord with law or statutory authority

Counts Two and Three challenge the legal authority upon which the Defendants based their decision to add Mr. Kareem to the Kill List. Mr. Kareem argues such a decision was not in accord with law and was in excess of statutory authority because it: (1) "violate[d] the prohibition on conspiring to or assassinating any person abroad contained in Executive Order 12,333"; (2) "violate[d] the prohibition against war crimes contained in 18 U.S.C. § 2441"; (3) "violate[d] Article 6 of the International Covenant on Civil and Political Rights"; (4) "violate[d] 18 U.S.C. § 956(a)(1), which prohibits conspiracy to commit murder or maiming outside the

United States"; and (5) "exceed[ed] the authority given to the Executive pursuant to the Authorization for the Use of Military Force."[4]  Compl. ¶¶ 73-76, 78.

This Court follows the functional approach to the political question doctrine adopted by the D.C. Circuit in *El-Shifa Pharmaceutical Industries v. United States* and applied in *Bin Ali Jaber v. United States*.  The Circuit distinguishes between "claims requiring [courts] to decide whether taking military action was wise—a policy choice and value determination constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch" and "claims presenting purely legal issues such as whether the government had legal authority to act."  *El-Shifa*, 607 F.3d at 842; *see also Jaber*, 861 F.3d at 246.  As discussed above, Mr. Kareem's first claim would require the Court to delve into the propriety or merit of the decision to place Mr. Kareem on the Kill List, which is beyond the Court's authority. Counts Two and Three, on the other hand, appear at first blush to present "pure[] legal issues," namely whether Defendants violated a pertinent legal authority when they placed Mr. Kareem on the Kill List.  However, the process of determining whether Defendants exceeded their authority or violated any of the statutes referenced in the Complaint would require the Court to make a finding on the propriety of the alleged action, which is prohibited by the political question doctrine.  Therefore, the Court finds Counts Two and Three raise a nonjusticiable political question and must be dismissed.

---

[4] The Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons [that] he determines planned, authorized, committed, or aided the terrorist attacks" of September 11, 2001.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004) (quoting 115 Stat. 224, § 2(a)).

> c. Counts Four, Five, and Six – Defendants denied Mr. Kareem his rights to due process and the opportunity to be heard and deprived him of his First, Fourth, and Fifth Amendment rights

Counts Four, Five, and Six ask the Court to find that Mr. Kareem was deprived of his constitutional rights when Defendants designated him for the Kill List and denied him of a prior opportunity to be heard. *See* Compl. ¶¶ 81-93. "[T]he Supreme Court has repeatedly found that claims based on [due process] rights are justiciable, even if they implicate foreign policy decisions." *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988) (citing *Regan v. Wald*, 468 U.S. 222 (1984); *Dames & Moore v. Regan*, 453 U.S. 654 (1981)); *see also Boumediene v. Bush,* 553 U.S. 723, 742 (2008) ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches. This design serves not only to make Government accountable but also to secure individual liberty."); *Hamdi*, 542 U.S. at 536-37 (emphasizing, with respect to challenges to the factual basis of a citizen's detention, that "it would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to . . . his detention by his Government, simply because the Executive opposes making available such a challenge"); *id.* at 536 ("Whatever power the United States Constitution envisions for the Executive . . . in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."); *Califano v. Sanders*, 430 U.S. 99, 109 (1977) (recognizing "the well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed"); *Vance v. Rumsfeld*, 653 F.3d 591, 618-19 (7th Cir. 2011), *rev'd en banc on other grounds*, 701 F.3d 193 ("Courts reviewing claims of torture in violation of statutes such as the Detainee Treatment Act or in violation of the Fifth

Amendment do not endanger the separation of powers, but instead reinforce the complementary roles played by the three branches of our government.").

Due process is not merely an old and dusty procedural obligation required by Robert's Rules.[5] Instead, it is a living, breathing concept that protects U.S. persons from over-reaching government action even, perhaps, on an occasion of war. In *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, a group of U.S. citizens living in Nicaragua advanced Fifth Amendment claims challenging U.S. support of military actions by the so-called "Contras." 859 F.2d at 935. They argued that U.S. funding to the Contras deprived the plaintiffs of liberty and property without due process of law because the plaintiffs were physically threatened by the war in Nicaragua and were the intended targets of the Contras. *Id.* On appeal, the D.C. Circuit decided that the plaintiffs' due process claims were "serious allegations and not ones to be dismissed as nonjusticiable" because "the Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry." *Id.* (quoting *Ramirez de Arellano*, 745 F.2d at 1515).[6]

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). It requires that a plaintiff show a protected interest in life, liberty, or property, *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), and that government officials knowingly deprived him of

---

[5] *Robert's Rules of Order* is a commonly used manual of parliamentary or organizational procedure in the United States.

[6] *U.S. Citizens v. Reagan* found the plaintiffs' Fifth Amendment claims justiciable, but ultimately declined to hear them because the plaintiffs did not allege that the United States participated in or encouraged injuries to Americans in Nicaragua. *See* 859 F.2d at 934-35.

that interest, *Daniels v. Williams*, 474 U.S. 327, 335-36 (1986), without notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Mr. Kareem alleges that the Defendants targeted him for lethal force by putting his name on the Kill List, which he deduces from five near misses by drones or other military strikes. As a U.S. citizen, he seeks to clarify his status and profession to Defendants and, thereby, assert his right to due process and a prior opportunity to be heard. His interest in avoiding the erroneous deprivation of his life is uniquely compelling. *See Ake v. Oklahoma*, 470 U.S. 68, 78 (1985) ("The private interest in the accuracy of a criminal proceedings that places an individual's life or liberty at risk is almost uniquely compelling."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]his qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.").

Defendants rely on the analysis in *El-Shifa* to contend that this case is non-justiciable. *See* 607 F.3d 836. The *El-Shifa* plaintiffs were owners of a Sudanese pharmaceutical plant who sued the United States after their plant was destroyed by a missile strike. U.S. officials asserted that the plant had been producing chemical weapons for Osama bin Laden. *Id.* at 838-39. The plaintiffs sought compensation for the plant's destruction and the retraction of allegedly defamatory statements connecting them to al-Qaeda. *Id.* at 839. The Circuit dismissed their suit as barred by the political question doctrine. *Id.* at 840-44. *El-Shifa* is distinguishable from this case in key respects—the *El-Shifa* plaintiffs were not U.S. persons and there was no allegation that they had a substantial connection to the United States that might have given rise to cognizable constitutional rights. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *32 Cnty.*

*Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (holding that a foreign plaintiff was not entitled to due process regarding the State Department's designation of it as a foreign terrorist organization because plaintiff did not have a controlling interest in property in the United States and did not show any other substantial connection). Importantly, unlikethe plaintiffs in *El-Shifa* and *Jaber*, Mr. Kareem does not seek a ruling that a strike by the U.S. military was mistaken or improper. He seeks his birthright instead: a timely assertion of his due process rights under the Constitution to be heard before he might be included on the Kill List and his First Amendment rights to free speech before he might be targeted for lethal action due to his profession. The D.C. Circuit and the Supreme Court have previously held that a citizen "must have a meaningful opportunity to challenge the factual basis for his designation as an enemy combatant." *Doe v. Mattis*, 889 F.3d 745, 759 (D.C. Cir. 2018); *see also Hamdi*, 542 U.S. at 533 ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."). The Circuit recently extended the protections provided to detainees in *Hamdi v. Rumsfeld* to a citizen in a foreign country opposing transfer from U.S. custody to the custody of another nation. *See Doe v. Mattis*, 889 F.3d at 761-62. While these latter cases provide only guidance, not decision, their guidance is useful here because constitutional norms were extended to U.S. citizens abroad despite the context of war-making. The difference between them and the instant matter is also notable: Mr. Kareem is not in U.S. custody and, if targeted because he is on the Kill List, may well have been identified by means other than his name, profession, place of birth, and the like. Now that he has made it to a U.S. court, however, his constitutional rights as a citizen must be recognized.

Neither of the *al-Aulaqi* decisions provides a useful final analysis here. Nasser al-Aulaqi challenged "the facts of military decisions exercised thousands of miles from the forum" and did so before the Presidential Policy Guidance was developed in 2013 or published in 2016, thereby establishing the system whereby such identification of targets is made by the principals of U.S. defense agencies or the President in Washington. *Al-Aulaqi I*, 727 F. Supp. 2d at 45. The *Bivens* suit filed by Nasser al-Aulaqi after his son's death was decided on the peculiarities of *Bivens* precedent and the applicability of that decision to new fact patterns. This case is brought by a U.S. citizen who seeks to interpose accurate personal information concerning his profession and activities into specific targeting decisions.

These are weighty matters of law and fact but constitutional questions are the bread and butter of the federal judiciary. The Court finds that Counts Four, Five, and Six as presented by Mr. Kareem are justiciable.

## B. Failure to State a Claim

Defendants' final argument in support of dismissal is the same as the first. They argue that Mr. Kareem's allegations that he has been put on the Kill List are implausible and, therefore, fail to state a claim upon which relief may be granted. For the reasons stated above, the Court finds that Mr. Kareem's allegations may be wrong as a matter of fact but the Complaint presents them in a plausible manner. It will deny Defendants' motion to dismiss for failure to state a claim.

## IV.  CONCLUSION

For the foregoing reasons the Court will grant in part and deny in part Defendants' Motion to Dismiss [Dkt. 8].  A memorializing Order accompanies this Memorandum Opinion.

Date: June 13, 2018

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge