**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AHMAD MUAFFAQ ZAIDAN, *et al*.,

        Plaintiffs,

    v.

DONALD J. TRUMP*, et al.*,

        Defendants.

Civil Action No. 17-00581 (RMC)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Jeffrey D. Robinson (D.C. Bar #376037)
*jeffrey.robinson@lbkmlaw.com*
Tara J. Plochocki (D.C. Bar #989404)
*tara.plochocki@lbkmlaw.com*
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1101 New York Avenue NW, Suite 1000
Washington, D.C.  20005
(202) 833-8900

Jennifer Gibson (Cal. Bar #288516)
Reprieve
P.O. Box 72054
London EC3P 3BZ
+44 (0)207 553 8152

April 1, 2019

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...............................................................................................................1

RELEVANT BACKGROUND ............................................................................................2

LEGAL ARGUMENT.........................................................................................................3

    A.  U.S. CITIZENS ARE ENTITLED TO DUE PROCESS BEFORE THEIR
       GOVERNMENT MAY KILL THEM, AND THIS INCLUDES KNOWING
       WHETHER THE GOVERNMENT INTENDS TO KILL THEM ....................................4

    B.  COURTS ROUTINELY ORDER THE DISCLOSURE OF CLASSIFIED
       INFORMATION.............................................................................................................7

    C.  THERE IS NO SUPPORT FOR THE PROPOSITION THAT THE STATE
       SECRETS PRIVILEGE MAY BE USED TO PREVENT A U.S. CITIZEN
       FROM CHALLENGING THE DECISION TO KILL HIM............................................11

    D.  THERE IS SIGNIFICANT RELEVANT PUBLIC INFORMATION
       AVAILABLE ABOUT THE GOVERNMENT'S TARGETED KILLING
       PROGRAM....................................................................................................................15

CONCLUSION..................................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Ake v. Oklahoma,*
470 U.S. 68 (1985) ............................................................................................. 4

*Al-Aulaqi v. Obama,*
727 F. Supp.2d 1 (D.D.C. 2010) ....................................................................... 2

*Al-Aulaqi v. Panetta,*
35 F. Supp. 3d 56 (D.D.C. 2014) ..................................................................... 21

*Brady v. Maryland,*
373 U.S. 83 (1963) ............................................................................................. 7

*California v. Ramos,*
463 U.S. 992 (1983) ........................................................................................... 5

*Doe v. Mattis,*
889 F.3d 745 (D.C. Cir. 2018) ......................................................................... 2

*Ellsberg v. Mitchell,*
709 F.2d 51 (D.C. Cir. 1983) ......................................................................... 13

*Fitzgerald v. Penthouse Int'l, Ltd.,*
776 F.2d 1236 (4th Cir. 1985) ........................................................................ 14

*Ford v. Wainwright,*
477 U.S. 399 (1986) ........................................................................................... 5

*Fuentes v. Shevin,*
407 U.S. 67 (1972) ............................................................................................. 6

*Gardner v. Florida,*
430 U.S. 349 (1977) ........................................................................................... 4

*Halkin v. Helms,*
598 F.2d 1 (D.C. Cir. 1978) ........................................................................... 12

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ........................................................................................... 6

*In re Sealed Case (Horn)*
494 F.3d 139 (D.C. Cir. 2007) ................................................................. 12, 13

*In re Terrorist Bombings of U.S. Embassies in E. Africa,*
552 F.3d 93 (2d Cir. 2008) ............................................................................. 10

*In re United States,*
872 F.2d 472 (D.C. Cir. 1989) ....................................................................... 13

*Jencks v. United States,*
353 U.S. 657 (1957) ........................................................................................... 8

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ......................................................................... 20

*Mohamed v. Jeppesen Dataplan, Inc.,*
  614 F.3d 1070 (9th Cir. 2010) ............................................................. 12

*Molerio v. F.B.I.,*
  749 F.2d 815 (D.C. Cir. 1984) ............................................................. 14

*Morrisey v. Brewer,*
  408 U.S. 471 (1972) ............................................................................. 6

*New York Times Co. v. U.S. Dep't of Justice,*
  756 F.3d 100 (2d Cir. 2014), *opinion amended on denial of reh'g,* 758 F.3d 436 (2d
  Cir. 2014), *supplemented,* 762 F.3d 233 (2d Cir. 2014) ............................... 16

*Roviaro v. United States,*
  353 U.S. 53 (1957) ......................................................................... 8, 9, 10, 13

*United States v. Abu-Jihaad,*
  630 F.3d 102 (2d Cir. 2010) ............................................................... 8

*United States v. Aref,*
  533 F.3d 72 (2d Cir. 2008) ................................................................. 8

*United States v. Coplon,*
  185 F.2d 629 (2d Cir. 1950) ............................................................... 11

*United States v. Reynolds,*
  345 U.S. 1 (1953) .......................................................................... 8, 11

*United States v. Rosen,*
  557 F.3d 192 (4th Cir. 2009) .............................................................. 10

*United States v. Shehadeh,*
  857 F. Supp. 2d 290 (E.D.N.Y. 2012) ............................................... 10, 13

*United States v. Yunis,*
  867 F.2d 617 (D.C. Cir. 1989) ............................................................ 9

*Woodson v. North Carolina,*
  428 U.S. 280 (1976) ........................................................................... 5

## STATUTORY AUTHORITIES

18 U.S.C. § App 3 § 1 ...................................................................... 9, 10

**INTRODUCTION**

The government argues in its motion to dismiss that the United States may execute one of its citizens without affording him due process, insisting that both the fact of and the reasons for its decision to do so cannot be examined or challenged because of the state secrets evidentiary privilege.  By invoking the state secrets privilege in the context of designating a U.S. citizen for lethal action, the government seeks to shield itself from all inquiry into the process by which it acts as prosecutor, judge, jury and executioner of plaintiff Bilal Abdul Kareem.  There is no precedent of any kind supporting the government's contention that mere invocation of the state secrets privilege can wholly displace the constitutional guarantee of due process.  This case should not be the first.

While the state secrets privilege may preclude relief in some circumstances, this is not one of them.  This Court ruled in its June 13 memorandum opinion that Mr. Kareem is entitled to assert the due process rights that are his "birthright" in an effort to protect his life.  Mem. Op. at 28.  No evidentiary privilege overrides the constitutionally-enshrined promise from the government to its citizens that they shall not be put to death without due process.

In the past, the government appears to have agreed.  In the only other known instance in which the government decided to kill a U.S. citizen via its targeting program, government officials announced their intention to do so publicly and explained that they believed that the citizen – Anwar al-Aulaqi – was an Al Qaeda operative who was recruiting for the terrorist network and participating in plots to attack the United States.  That disclosure in no way impeded the government's eventual assassination of al-Aulaqi, despite the fact that, forewarned, he could have taken steps to evade these efforts.  As this litigation demonstrates, Mr. Kareem is already aware of the government's efforts.  The question presented here is not whether the government is able to kill Mr. Kareem, it is whether the government is legally permitted to do so.

Prior to the lethal strike on al-Aulaqi, the court all but invited him to avail himself of his own rights to judicial review when it dismissed a case that had been brought on his behalf by his father for lack of standing. *Al-Aulaqi v. Obama*, 727 F. Supp.2d 1 (D.D.C. 2010). Now that Mr. Kareem has followed the court's guidance, the government wants to block any due process review, despite the *al-Aulaqi* court's and now this Court's assurances that a U.S. citizen can and should invoke his constitutional rights in precisely these circumstances.

While the government may have legitimate secrecy concerns, its invocation of the privilege sweeps far too broadly. Its concerns can be met in an appropriately managed judicial proceeding, but its proposal simply to dismiss this action with no accommodation to Mr. Kareem's bedrock constitutional rights is untenable, and its motion should be denied.

## RELEVANT BACKGROUND

Plaintiff Kareem filed his complaint in March 2017 alleging that he was the victim of five near-miss attacks within a three-month period during 2016, including at least one strike from a Hellfire missile of the type used by the United States. Mr. Kareem surmised that because of his activities as a journalist, the government may have erroneously concluded – whether through use of metadata or otherwise – that he was a member of Al Qaeda or some other extremist group. This Court concluded that the facts pleaded established a plausible basis for relief, namely the right to due process, a "meaningful opportunity to challenge the factual basis for his designation as an enemy combatant." Mem. Op. at 28, citing *Doe v. Mattis*, 889 F.3d 745, 759 (D.C. Cir. 2018).

At the Court's direction, the parties met and conferred over possible means to settle this dispute. The government, however, rejected any compromise, refusing to provide any information whatsoever about whether it had targeted Mr. Kareem for lethal action and, if so, the

factual basis for its decision to target him.  It even refused to provide any information about what kinds of activity could factor into such a decision, so that Mr. Kareem could anticipate and address what the government might find relevant in determining whether or not to spare him his life.  Given the government's position, additional discussions were fruitless, and this action was resumed.  The government then filed a second motion to dismiss, this one invoking the state secrets evidentiary privilege.

## LEGAL ARGUMENT

As this Court rightly observed, this case presents issues that are the "bread and butter of the federal judiciary."  Mem. Op. at 29.  Indeed, given the tension between a citizen's inviolable rights to due process when his life is at stake and the government's interests in secrecy in certain national security matters, this is a case that only this Court can resolve.  Mr. Kareem has a constitutionally-protected right not to be deprived of his life without due process.  While the government in appropriate circumstances has a right to invoke an evidentiary privilege to protect state secrets, that privilege cannot be allowed to defeat the fundamental due process right where a judicial solution balancing the two can be crafted.

The Court should deny this second motion to dismiss for several related reasons.  First, Mr. Kareem's constitutional guarantee to due process before his life is taken by governmental action is a bedrock principle of U.S. law.  It cannot be forfeited by the government's mere assertion that state secrets are at stake.

At most, invocation of the state secrets privilege can influence the Court's determination of what "process" is "due."  It does not obviate the right to due process entirely.  The Court can and should examine the government's assertion and, while making such accommodations to the government's legitimate secrecy interests as are feasible, should order the government to

disclose whether Mr. Kareem has been targeted for assassination and the factual basis for that designation.  Second, courts routinely order the disclosure of classified information to protect due process rights and fashion procedures to protect that information.  Third, the government is wrong about what the cases it has cited actually hold; no case concerning the state secrets privilege has ever held that the privilege may be invoked to absolve the government from affording a U.S. citizen due process before it kills him.  The Court should not yield to its demands for an unfounded and unwarranted extension of the privilege.  Fourth, the government overstates the extent to which the issues raised by the complaint are actually secret.  The government itself has made public many of the facts it now claims would threaten national security if disclosed.  The contention that harm will come from the disclosure or repetition of such facts in this Court is without merit.

### A. U.S. CITIZENS ARE ENTITLED TO DUE PROCESS BEFORE THEIR GOVERNMENT MAY KILL THEM, AND THIS INCLUDES KNOWING WHETHER THE GOVERNMENT INTENDS TO KILL THEM.

The issues in this case go to the most important of a citizen's constitutional rights:  the right of a citizen not to be deprived of his life by his government without due process of law.  The right to meaningful due process in these circumstances is paramount.  "[T]he action of the sovereign in taking the life of one of its citizens . . . differs dramatically from any other legitimate state action."  *Gardner v. Florida*, 430 U.S. 349, 357–58 (1977).  The consequences of this action are too severe, and the right too foundational to a constitutional democracy, to allow the government to secretly condemn an American citizen to death, and then when that citizen discovers the impending sentence refuse to identify the basis for this sanction that might allow him to challenge it.  "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling."  *Ake v. Oklahoma*, 470 U.S. 68,

78 (1985).  Accordingly, this Court should deny the government's motion and rule instead that the government's targeting of a U.S. citizen for lethal action – at least in these narrow and exceptional circumstances in which that individual (i) has become aware of the intent to kill him, (ii) comes to the courthouse door seeking the due process that has been denied him, and (iii) plausibly alleges that the government has mistakenly designated him for lethal action – cannot be deemed a state secret protected by the common law evidentiary privilege invoked here.

The Supreme Court has recognized a body of constitutionally required procedural protections that apply in capital punishment cases premised on the fact that "death is different." *E.g., Ford v. Wainwright*, 477 U.S. 399, 411 (1986).  Because of its qualitative difference from "all other punishments," the Court has insisted "upon a correspondingly greater degree of scrutiny" and has focused on implementing procedures to ensure that punishment is "not meted out arbitrarily or capriciously."   *California v. Ramos*, 463 U.S. 992, 999 (1983).   Such procedures include requiring disclosure to the accused of any confidential information that the government has used or intends to use as a basis to impose the death penalty (*Gardner*, 430 U.S. at 362) and requiring consideration of the character and record of the individual offender (*Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)).  Providing an alleged offender a fulsome record of the allegations and considerations that will be used against him is integral to the fairness of any process that may result in his death, and it ordinarily trumps whatever confidentiality considerations may be raised by the government.  For similar reasons, no such determination can be made without the alleged offender having an opportunity to present mitigating information that may not be reflected in the existing record to the arbiter of that decision.  These are not controversial protections.  Indeed, they are guaranteed even when the offender faces punishment far less severe for the commission of an ordinary crime.

While procedural protections are more robust when death is the sanction, due process has never been less than notice of the basis for the adverse determination and an opportunity to challenge it, even in the war on terror.   "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'"   *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).   As this Court (and the government) well know, the Supreme Court has insisted on enforcing due process for U.S. citizens in circumstances implicating national security, even in the exigencies of war and even where the penalty at issue (detention) is significantly less severe than the death sentence at issue here.   In *Hamdi v. Rumsfeld*, a plurality of the Court held that "a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."   542 U.S. at 533.   These two pillars of due process – notice and a hearing – have withstood 18 years of the war on terror and numerous national security-related criminal trials without compromising national security.   There is no reason to question the propriety of continuing to honor them here.

As this Court observed, "due process is flexible and calls for such procedural protections as the particular situation demands."   Mem. Op. at 26, citing *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972).   However, due process would not be satisfied by limiting the accused to unilaterally contending that he is innocent of unknown charges in the hopes of persuading a silent, opaque coterie of government officials not to kill him.

The government's assertion that its decisions as to Mr. Kareem cannot be tested without revealing state secret information can be examined by how it would likely fare in a different and

more common setting.  If Mr. Kareem had engaged in conduct sufficient (in the government's view) to justify killing him with an airstrike, then he would surely have also engaged in conduct deemed sufficient for the government to prosecute him.  During those criminal proceedings, Mr. Kareem would have to be informed of the factual basis for the charges against him, permitted to examine the relevant evidence, including exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and allowed to cross-examine witnesses before a neutral judge or jury.  Yet here the government seeks to impose the ultimate penalty *without* trial while claiming a secrecy privilege that would be unavailable had a trial taken place.  The Constitution does not permit the government to evade judicial scrutiny by electing to bypass trial in favor of summary execution.

The government fails to acknowledge Mr. Kareem's uniquely compelling interest in his own life and breezes past the fact that he is a U.S. citizen before reciting the mantra that any disclosure of *any* information relevant to this case "reasonably could be expected to harm the national security of the United States."  Mot. at 17.  In so doing, the government makes the chilling assertion that it has the right to decide to and then actually kill its citizens based on secret information, without any of the protections afforded by the Constitution.  *Id*. at 10-11.  If Mr. Kareem cannot meaningfully challenge his designation now, he will never be able to do so, and he will live in fear awaiting the next time a strike on him occurs.  Granting the motion to dismiss would be tantamount to a holding that the state secrets privilege extinguishes the Fifth Amendment, upending Supreme Court precedent that a U.S. citizen facing death at the hands of his government *must* be afforded due process.

## B. COURTS ROUTINELY ORDER THE DISCLOSURE OF CLASSIFIED INFORMATION.

The state secrets privilege is not an absolute barrier to relief; courts have held that it "must give way under some circumstances to a criminal defendant's right to present a

meaningful defense." *United States v. Aref*, 533 F.3d 72, 79 (2d Cir. 2008); *United States v. Abu-Jihaad*, 630 F.3d 102, 141 (2d Cir. 2010) (discussing when a defendant's right to present a defense "displaces" the state secrets privilege).  This is because when the government stands poised to take action against an accused, "it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." *United States v. Reynolds*, 345 U.S. 1, 12 (1953).  This commitment to fairness is unwavering.  The Supreme Court has held that a criminal action "must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony." *Jencks v. United States*, 353 U.S. 657, 672 (1957).  Mr. Kareem comes before this Court as the target of a government death sentence – although filed as a civil case, he is essentially seeking the right to intervene in a case that has been prosecuted against him in secret before he suffers the imposition of the sentence.  As in a public criminal prosecution, the government should be required to engage with him here or confirm that it is going to abandon its action against him.  And if the government elects to engage and give him the information that it would be required to provide in any other prosecution, then there are effective ways to both satisfy due process and to protect state secrets.

When faced with a conflict between secrecy and an individual's rights, the Supreme Court has instructed that there is "no fixed rule," but rather courts should "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62 (1957) (prejudicial error where government refused to disclose identity of informant in heroin transaction).  Courts may therefore order

limited disclosure of state secrets in circumstances such as these, where Mr. Kareem is at risk of being erroneously deprived of his life by the government on the basis of evidence which the government refuses to disclose, much less have tested.

Well-established procedures exist to ensure protection of the disclosures.  In keeping with the flexibility required by due process and in recognition of the equities in this case, the Court should order disclosure of the factual basis for any determination made to target Mr. Kareem for lethal action, proceeding in accordance with the Classified Information Procedures Act ("CIPA").  CIPA governs the use of classified information in certain criminal cases but has also been used in cases where it did not expressly apply for guidance in determining a remedy.  *See United States v. Moussaoui*, 382 F.3d 453, 476 (4th Cir. 2004) (ordering the use of summaries of statements by enemy combatant witnesses who were not permitted to testify).

Classified information, by its definition, is information which may not be disclosed for reasons of national security.  18 U.S.C. § App. 3 § 1.  CIPA was originally drafted with espionage cases in mind, where the very subject of the litigation was a state secret.[1]  Intelligence agencies feared that the prosecution of Cold War spies would expose intelligence assets to foreign powers.  *Id*. at 18-19.  Through CIPA, Congress enacted a way to balance the government's interests in secrecy against the due process interests of a person who is the target of government action.  Due process rights afford defendants or their counsel access to classified information, handled in accordance with CIPA's safeguards, that is material or "helpful to the defense of [the] accused."  *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) (quoting *Roviaro*, 353 U.S. at 60-61).  If classified documents cannot be disclosed, CIPA permits the

---

[1]Serrin Turner & Stephen J. Schulhofer, *The Secrecy Problem in Terrorism Trials* (Brennan Ctr. for Justice at N.Y.U. School of Law, 2005), https://www.brennancenter.org/sites/default/files/legacy/publications/20050000.TheSecrecyProbleminTerrorismTrials.pdf.

government to substitute that information with a summary instead.  If no fair substitution can be provided, then the court may impose sanctions, not to punish the government, but to protect the integrity of the trial.  These may include striking all or part of a witness's testimony, resolving an issue of fact against the United States, or dismissing part or all of the indictment.  *See* 18 U.S.C. § App. 3 § 6(e).

For instance, in *United States v. Rosen*, several individuals affiliated with AIPAC were charged with obtaining national defense information from sources in the U.S. government and unlawfully passing that information to AIPAC staffers and foreign officials.  The Fourth Circuit upheld the district court's order to admit classified information over the government's objections.  The district court had allowed limited redactions, and the summaries omitted sources and methods of the government's intelligence-gathering.  557 F.3d 192, 199 (4th Cir. 2009). Similarly, in the prosecution of an individual for lying to federal agents about traveling to Pakistan to join a violent insurgent group, the district court ruled that under *Roviaro*, 353 U.S. at 60-61, the state secrets privilege must "give way" when information material to the defense is at issue.  Accordingly, the court held an *ex parte* conference with the defense team to ascertain whether the information at issue would be useful to its defense strategy and then approved for disclosure summaries of certain classified documents that the government sought to withhold. *United States v. Shehadeh*, 857 F. Supp. 2d 290, 294 (E.D.N.Y. 2012).  In other cases, such as the prosecution for the embassy bombings in Somalia, the government avoided disclosure of state secrets by stipulating to the facts sought to be established.  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 125 (2d Cir. 2008).

Here, Mr. Kareem seeks to know the factual basis for any adverse determination made that resulted in or remains the basis for the government's decision to target him for lethal action.

10

If Mr. Kareem has been so targeted, then the government possesses the information relevant to that determination and acted upon it and may act upon it again.  Proceeding against him on the basis of that information while refusing to disclose it is a "denial of [an individual's] constitutional right"; there is "no significant distinction between introducing evidence against an accused which he is not allowed to see, and denying him the right to put in evidence on his own behalf."  *United States v. Coplon*, 185 F.2d 629, 638 (2d Cir. 1950).  For this reason, a blind submission of evidence in his own defense is a wholly inadequate method of satisfying his due process rights; the potential remains that the government will continue to rely on evidence that, if he knew what it was, Mr. Kareem would be able to counter as wrong, misunderstood, or simply not credible.  To recognize Mr. Kareem's due process rights in any meaningful way, the government must make its disclosures, and Mr. Kareem must have the opportunity to rebut or explain them  The well-established and proven procedures laid out in CIPA provide a means to do just that where, as here, the state secrets privilege must "give way" in order that Mr. Kareem's government cannot designate him for death without due process.

### C. THERE IS NO SUPPORT FOR THE PROPOSITION THAT THE STATE SECRETS PRIVILEGE MAY BE USED TO PREVENT A U.S. CITIZEN FROM CHALLENGING THE DECISION TO KILL HIM.

Not one of the cases cited by the government supports its argument for the extraordinary extension of the state secrets doctrine advanced in its motion.  To apply the doctrine as requested here may, and likely will, result in Mr. Kareem's death.  In no case has the government successfully invoked the state secrets privilege to such draconian and irredeemable effect.

The government relies on cases that primarily sought backward-looking relief.  *United States v. Reynolds* was a tort action concerning the death of three civilians in a military airplane crash in which no constitutional rights were at issue.  345 U.S. at 3.  The plaintiffs sought

discovery of the Air Force reports relating to the crash, but government invoked the state secrets privilege because those reports referenced secret electronic equipment that was being tested on the flight.  The case was remanded to proceed without the requested discovery.  In *Halkin v. Helms*, 598 F.2d 1, 3 (D.C. Cir. 1978), individuals and organizations formerly active in opposing participation by the United States in the war in Vietnam brought an action for damages for past warrantless interceptions of their international wire, cable, and telephone communications.  They suspected interception because they were on a watchlist, but did not have any other basis for concluding that their communications had been intercepted.  Their discovery request for information from the National Security Agency that would have disclosed methods and techniques of gathering foreign communications was denied.  A former DEA agent's *Bivens* action for Fourth Amendment violations was permitted to proceed on the basis of the circumstantial evidence he had alleged, since a jury could reasonably infer that his rights were violated based on events and conversations that he and others had witnessed.  *In re Sealed Case (Horn)*, 494 F.3d 139, 141 (D.C. Cir. 2007).  In *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1073 (9th Cir. 2010) foreign nationals brought suit against a U.S. corporation not under the Constitution, but the Alien Tort Statute, seeking to impose liability for torture that had been inflicted by a government contractor at CIA black sites.  Because the government's invocation of the state secrets doctrine deprived the defendant government contractor of the possibility of defending itself, the case was dismissed.

None of those cases involved a prosecution of a U.S. citizen or any action analogous to a prosecution.  All of these cases are fundamentally about permitting the state secrets privilege to limit a plaintiff's ability to recover for past wrongs and bear no resemblance to the case at hand. In those cases the damage had been done already.  The invocation of state secrets may well have

been unfair to the individual litigants in these cases, but they represent an ordinary application of an evidentiary privilege which by its nature may preclude a party from gaining access to relevant evidence. That privilege gives way when the competing interest in disclosure is more compelling, as it is here. *E.g., Roviaro*, 353 U.S. 53; *Shehadeh*, 857 F. Supp. 2d 290. It is one thing to decide that the law of evidence can bar recovery for damages or foreclose declaratory relief about past harm, but it is entirely another to create an evidentiary privilege that leaves a U.S. citizen without recourse to prevent his death by future drone strike by his government. Such a rule would run contrary to the guidance of this Circuit, which admonishes the government for invocation of the privilege where it "eliminate[s] substantive rights from the outset" and disfavors "broad assertions by the United States that certain subject matters are off-limits for judicial review." *In re Sealed Case (Horn)*, 494 F.3d at 151.

But in any event, the government's motion does not make the case that its interest here outweighs the plaintiff's unique and vital interest in his life. State secrets jurisprudence is exceedingly clear that where the plaintiff has made "a compelling showing of need for the information in question . . . a judge is required to examine carefully a claim of privilege to satisfy himself of its legitimacy." *Ellsberg v. Mitchell*, 709 F.2d 51, 61 (D.C. Cir. 1983). The D.C. Circuit cautioned that "a court must not merely unthinkingly ratify the executive's assertion of absolute privilege, lest it inappropriately abandon its important judicial role." *In re United States*, 872 F.2d 472, 475 (D.C. Cir. 1989) (denying government petition for writ of mandamus where district court determined that litigation could proceed without jeopardizing national security). And, as per *Roviaro*, the court should decide whether to order disclosure based on a balancing of the interests at stake. Without any particularized showing by the government of what secrets it feels are so vital to protect, the balance weighs entirely in Mr. Kareem's favor.

There can be no more compelling need for evidence than Mr. Kareem's need in this case. He has a "uniquely compelling interest" "in avoiding the erroneous deprivation of his life." Mem. Op. at 27. This is his one chance to protect that interest. Dismissal or denial of evidence leaves him with two options, both of which are tantamount to a wholesale denial of due process: 1) guessing why the government wants to kill him, and again asking them not to with no assurance that anything he says will be considered; and/or 2) wait to be killed. Never has the state secrets privilege been held to compel such a result.

Even though some information at issue in this case may be appropriately protected by the state secrets privilege, there is no reason to dismiss the case. "Only when no amount of effort and care on the part of the court and the parties will safeguard privileged material is dismissal warranted." *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1244 (4th Cir. 1985). "Often, through creativity and care, this unfairness can be minimized through the use of procedures which will protect the privilege and yet allow the merits of the controversy to be decided in some form." *Id.* at 1238 n. 3. As discussed above, the Court may employ procedures set forth in CIPA to proceed in this case. The Court may also examine information *in camera* to make a determination about whether the case has merit. In *Molerio v. F.B.I.,* 749 F.2d 815, 822-26 (D.C. Cir. 1984), the plaintiff alleged that the FBI refused to hire him for illegal and unconstitutional reasons. The FBI invoked the state secrets doctrine, but submitted to the court an affidavit which specifically disclosed the reason it declined to hire. The court granted summary judgment to the government. In light of the gravity of the plaintiff's interest in protecting his own life and the availability of methods to address the government's security concerns, the Court should not expand the application of the state secrets privilege to foreclose litigation of this case.

**D. THERE IS SIGNIFICANT RELEVANT PUBLIC INFORMATION
AVAILABLE ABOUT THE GOVERNMENT'S TARGETED KILLING
PROGRAM.**

The state secrets privilege does not apply to information that is in the public domain, and
the government's attempt to sweep everything relevant to this case into the ambit of state secrets
should not be credited.  Moreover, whether the disclosure of the fact that an individual has been
targeted for lethal action harms national security can be determined on a case by case basis.  This
is evident from the fact that the government felt itself free to announce its targeting of Anwar al-
Aulaqi, another U.S. citizen, for lethal action, and then successfully killed him a few months
later.   The government's disclosures about al-Aulaqi had no apparent ill-effect on U.S.
operational capability in that matter, and nothing in the affidavits in the instant action indicates
anything that precludes disclosure here.

Much of the information relevant to the merits of this case is already public.  The
Declaration of Patrick M. Shanahan, in his capacity as Acting Secretary of Defense, broadly
asserts that military operations in Syria are secret.  This assertion is undercut by his admission
that the Department of Defense publishes the number of strikes it makes, their dates, and their
locations.  Shanahan Decl. ¶ 11.  He further asserts that there were no strikes in the vicinity of
Mr. Kareem around the dates or times indicated in the complaint.  *Id.*  According to information
published by the DoD, it made 335 strikes in June 2016.  What "general location" means and
whether any of those strikes could have been the ones suffered by Mr. Kareem are subjects on
which there can be reasonable disagreement.  Moreover, during the course of the conflict in
Syria, the DoD has repeatedly failed to acknowledge the full extent of the strikes it is taking.[2]

---

[2] *See, e.g., Limited Accountability: A transparency audit of the Coalition air war against so-
called Islamic State*, Remote Control (December 2016) https://airwars.org/wp-
content/uploads/2016/12/Airwars-report_Web-FINAL1.compressed.pdf ("Of the 62 incidents

The declaration of the Acting Secretary alone is certainly not conclusive evidence that Mr. Kareem has not been targeted, and, if this were the fact, a straightforward declaration by the Acting Secretary that he is not being targeted would be simple enough to make and would be appear to be without national security consequences.

Non-profit organizations such as Airwars document the number of strikes taken by the U.S. and coalition on a month by month basis.  From June 1 - June 26, Airwars determined that 353 strikes had been made by the U.S. in Syria based on official coalition public sources.[3]  This leaves at least a few more strikes other than those disclosed by the DoD.  It is also possible that Mr. Kareem was targeted by another intelligence agency, such as the Central Intelligence Agency.   Director Coats asserts in his declaration that whether the intelligence community targets individuals for the use of lethal force is a state secret, but this contention, too, is without facial support.  The Second Circuit expressly found that the CIA had waived the right to assert secrecy over its targeting program because its director had discussed the program in public.  *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 122 (2d Cir. 2014), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014) (ordering CIA to submit *Vaughan* index in response to FOIA request about secret drone program).  In September 2015 the Washington Post reported that U.S. officials disclosed that the "CIA and U.S. Special Operations forces have launched a secret campaign to hunt terrorism suspects in Syria as part of a targeted killing program that is run separately from the broader U.S. military offensive against the Islamic State" and that these "high value targets" "are being

---

conceded by CENTCOM to December 1st 2016, 30 cases were never publicly reported at the time as far as Airwars can determine.")

[3] Cumulative US and allied airstrikes in Syria, https://airwars.org/data/ (last visited March 31, 2019).

identified and targeted through a separate effort."[4]  Former CIA Director Michael Hayden wrote

an op-ed about the CIA's drone program.[5]  The government cannot now claim that U.S.

intelligence agencies' involvement in the targeted killing program is a state secret.

In fact, former CIA Director John Brennan, then in his capacity as Assistant to the

President for Homeland Security and Counterterrorism, spoke at length about the process by

which the intelligence community determines whether to designate someone for lethal action.[6]

These steps included:

1. After assessment that a suspected terrorist poses a threat to the United States, the person's name may be raised for consideration.

2. The proposal goes through careful review, and if appropriate, is evaluated by the very most senior officials in the government for a decision.

3. In order to proceed, the designated individual must be a legitimate target under the law, that is, is a lawful target insofar as the AUMF permits use of force against this person by reason of his affiliation with Al Qaeda or associated forces.

4. If the individual is a lawful target, then a determination is made as to whether "that individual's activities rise to a certain threshold for action, and whether taking action will, in fact, enhance our security."

5. In connection with this evaluation, the agencies will ask whether the individual poses a "significant threat" to U.S. interests.  A "significant threat" means that the individual is either an operational leader of Al Qaeda or one of its associated forces, or is an operative training for or planning to carry out attacks against U.S. persons and interests."

---

[4] Greg Miller, *U.S. launches secret drone campaign to hunt Islamic State leaders in Syria*, Wash. Post, June 23, 2014, https://www.washingtonpost.com/world/national-security/us-launches-secret-drone-campaign-to-hunt-islamic-state-leaders-in-syria/2015/09/01/723b3e04-5033-11e5-933e-7d06c647a395_story.html?utm_term=.67432a1d74e4

[5] General Michael Hayden, To Keep America Safe, Embrace Drone Warfare, N.Y. Times (Feb. 19, 2016), https://www.nytimes.com/2016/02/21/opinion/sunday/drone-warfare-precise-effective-imperfect.html?ref=opinion

[6] John O. Brennan, Assistant to the President for Homeland Security and Counterterrorism, "The Ethics and Efficacy of the President's Counterterrorism Strategy" (Apr. 30, 2012), https://www.wilsoncenter.org/event/the-efficacy-and-ethics-us-counterterrorism-strategy.

6. The agencies prefer not to take lethal action unless capture is not feasible.

7. The agencies consider whether they may act unilaterally in another sovereign territory and whether its actions comport with the laws of war.

8. There must be a "high degree of confidence that innocent civilians will not be injured or killed, except in the rarest circumstances" before a strike is authorized.

Not only is it publicly established that the intelligence community is involved in drone strikes, but so, too, is the criteria that presumably would apply to Mr. Kareem. Additional documents are available to assist in this evaluation. In 2013, the Department of Justice released an official copy of its White Paper on the "Lawfulness of a Lethal Operation Directed Against a U.S. Citizen Who Is a Senior Operational Leader of Al-Qa'ida or An Associated Force" in connection with a FOIA request.[7] This paper indicates that as a baseline criterion, the person targeted would pose "an imminent threat of violent attack against the United States." *Id.* at 3. It also recites that the "Department assumes that the rights afforded by the Fifth Amendment's Due Process Clause, as well as the Fourth Amendment, attach to a U.S. citizen even while he is abroad," and that "[n]o private interest is more substantial" than ensuring that a person is not erroneously deprived of his life. *Id.* at 5, 6. Given the government's acknowledgement of this constitutionally protected interest, its refusal to disclose the circumstances pertaining to Mr. Kareem are inexplicable.

At issue in this case is the extent of due process required before the government may target a U.S. citizen for lethal action. The government's legal position on this question is public. According to the memorandum, the government reached the conclusion that it legally

> would be able to use lethal force against a U.S. citizen, who is located outside the United States and is an operational leader

---

[7] Steven Aftergood, *DoJ White Paper Released as a Matter of "Discretion"*, Secrecy News Blog (Feb. 11, 2013), https://fas.org/blogs/secrecy/2013/02/doj_discretion/; copy of White Paper at https://fas.org/irp/eprint/doj-lethal.pdf.

> continually planning attacks against U.S. persons and interests, in
> at least the following circumstances: (1) where an informed, high-
> level official of the U.S. government has determined that the
> targeted individual poses an imminent threat of violent attack
> against the United States; (2) where a capture operation would be
> infeasible and where those conducting the operation continue to
> monitor whether capture becomes feasible; and (3) where such an
> operation would be conducted consistent with applicable law of
> war principles.

*Id.* at 6.  The government has further disclosed how those principles have actually applied in

practice.   In 2014, the government released a 41-page memorandum ("al-Aulaqi Memo")

outlining the legal justification for killing Anwar al-Aulaqi.[8]  This memorandum discusses the

authority held by both the DoD and CIA to conduct lethal action operations against "AQAP

forces of which al-Aulaqi is a leader 'associated with' al Qaida forces for purposes of the

AUMF."  al-Aulaqi Memo at 21.  In its memorandum concerning its analysis of whether it could

legally kill al-Aulaqi, the government resolved its due process obligations to that U.S. citizen as

follows:

> we conclude that at least where, as here, the target's activities pose
> a "continued and imminent threat of violence or death" to U.S.
> persons, "the highest officers in the Intelligence Community have
> reviewed the factual basis" for the lethal operation, and a capture
> operation would be infeasible and where the CIA and DoD
> "continue to monitor whether changed circumstances would permit
> such an alternative," . . . the "realities of combat" and the weight of
> the government's interest in using an authorized means of lethal
> force against this enemy are such that the Constitution would not
> require the government to provide further process to the U.S.
> person before using such force.

---

[8] Greg Miller, *Legal memo backing drone strike that killed American Anwar al-Awlaki is
released*, Wash. Post, June 23, 2014, https://www.washingtonpost.com/world/national-
security/legal-memo-backing-drone-strike-is-released/2014/06/23/1f48dd16-faec-11e3-8176-
f2c941cf35f1_story.html?utm_term=.76c8746d1299; copy of al-Aulaqi Memo at
https://www.washingtonpost.com/r/2010-2019/WashingtonPost/2014/06/23/National-
Security/Graphics/memodrones.pdf?tid=a_inl_manual.

*Id.* at 40.   At a minimum, the Court could resolve on summary judgment whether the government's criteria set forth above, and as applied to Mr. Kareem, satisfies due process requirements.  This would not be a substitution for military judgment, but rather the execution of the court's duty to "to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Here, Director Coats and Acting Secretary Shanahan assert that it would harm national security to disclose whether the DoD or intelligence community has information on any specific individual.  That cannot be true as a categorical matter, and is entirely belied by the al-Aulaqi case.  Past precedent proves that this is determined on a case-by-case basis.  What is lacking from either declaration is why disclosure is not possible in *this* circumstance.  For decades, the government has routinely publicly identified terrorist targets.  The Department of State issues press releases when it designates an individual or an organization as a terrorist.[9]  The Department of Treasury maintains a registry of people affiliated with terrorism globally in connection with its terrorism and Syrian sanctions programs.  These "specially designated nationals" are put on notice that the U.S. government maintains intelligence on them, and this process enhances national security by preventing U.S. persons from transacting with them.  Terrorists are also listed on the FBI's most wanted list.[10]  During the Iraq War, it was well-publicized that the government issued a deck of playing cards with the faces and names of the 52 most-wanted Iraqis and distributed them to service personnel.[11]  It is possible both for a person to be alerted of

---

[9] U.S. Dep't of State, *Terrorism Designation Press Releases*, https://www.state.gov/j/ct/rls/other/des/index.htm (last visited March 31, 2019).

[10] FBI, *Most Wanted Terrorists*, https://www.fbi.gov/wanted/wanted_terrorists (last visited March 31, 2019).

[11] Joel Christie, *Dead hand: Deck of 52 Most-Wanted Iraqi playing cards given to soldiers at the start of the war shows the fall of Saddam 'The Ace of Spades' Hussein's army*, Daily Mail UK, Oct. 18, 2014, https://www.dailymail.co.uk/news/article-2798050/dead-hand-deck-52-

the fact that the U.S. government has suspicions about that individual's affiliations and conduct and for the U.S. government to be effective in protecting its interests.  They are not mutually exclusive, as suggested in the declarations provided.

The government then argues that to disclose whether it has targeted a person for lethal action would compromise its ability to take action and allow that individual to evade its efforts. But again, it is not true as a categorical matter that every designation for lethal action is a state secret.  In the case of al-Aulaqi, the government disclosed its designation of a U.S. citizen for lethal action.   On April 6, 2010, in an apparently coordinated media strategy, senior U.S. officials informed the major news outlets that al-Aulaqi had been targeted for assassination.[12]  In announcing this designation, the officials also explained what al-Aulaqi was suspected to have done – plotted attacks and recruited for Al Qaeda – providing at least some bare notice of the factual basis for its action.  The operation that ultimately resulted in his death does not appear to have been impeded by the provision of notice of the designation or the reasons behind it to al-Aulaqi (who even responded publicly).   Why the government chose to disclose al-Aulaqi's designation is unclear, but what is clear is that the government's invocation of state secrets in the instant circumstances appears entirely arbitrary and not based on an assessment as to whether it will adversely affect the operation.

This Court knows that the government sometimes kills people – including U.S. citizens – that it is not supposed to kill.  *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014).  Through

---

wanted-iraqi-playing-cards-given-soldiers-start-war-shows-fall-saddam-ace-spades-hussein-s-army.html

[12] *See, e.g.,* Scott Shane, *U.S. Approves Targeted Killing of American Cleric*, N.Y. Times, Apr. 6, 2010, https://www.nytimes.com/2010/04/07/world/middleeast/07yemen.html; Greg Miller, *Muslim Cleric Aulaqi is 1st U.S. citizen on List of those CIA Allowed to Kill*, Wash. Post, Apr. 7, 2010, http://www.washingtonpost.com/wpdyn/content/article/2010/04/06/AR2010040604121 _pf.html.

an unusual confluence of circumstances, including dumb luck in surviving the initial strikes, Mr.

Kareem has found himself in a position to come to this Court, invoke his Fifth Amendment

rights as they have been consistently interpreted by the Supreme Court, and challenge the factual

basis for any designation of him for lethal action.  Some of the information needed to make this

challenge is already in the public domain, and some is not.  But well-defined procedures exist to

allow disclosure in an orderly and careful way that will protect both Mr. Kareem's "uniquely

compelling" interest in his life, and the government's interest in maintaining state secrets.  Given

Mr. Kareem's non-derogable right to due process before the government may kill him, the

government's motion to dismiss must be denied.

## CONCLUSION

For the reasons set forth above, the Court should deny the government's motion to

dismiss.

Respectfully submitted,


/s/ Tara J. Plochocki
JEFFREY D. ROBINSON (D.C. Bar #376037)
TARA J. PLOCHOCKI (D.C. Bar #989404)
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
1101 New York Ave. NW,
Suite 1000
Washington, D.C.  20005
202-833-8900
jeffrey.robinson@lbkmlaw.com
tara.plochocki@lbkmlaw.com

Jennifer Gibson (Cal. Bar #288516)
Reprieve
P.O. Box 72054
London EC3P 3BZ
+44 (0)207 553 8152
Jennifer.gibson@reprieve.org.uk