## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AHMAD MUAFFAQ ZAIDAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-0581 (RMC) |
| | ) | |
| DONALD J. TRUMP, | ) | |
| President of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

Plaintiff Bilal Abdul Kareem ("Plaintiff" or "Kareem") claims that Defendants have designated him for the use of lethal force without due process of law.  As demonstrated in Defendants' opening brief, litigating any aspect of Kareem's claims (which Defendants cannot confirm or deny) directly implicates certain categories of national security information pertaining to alleged military and intelligence-community activities the disclosure of which could reasonably be expected to cause serious, and in some instances exceptionally grave, harm to the national security of the United States.[1]  Defendants have asserted the state secrets privilege over this information and have demonstrated that dismissal is required on that basis.

In his Opposition to Defendants' Motion to Dismiss, Kareem does not dispute that the public declarations filed by Director of National Intelligence Daniel R. Coats ("DNI") and Acting

---

[1] The categories include: (i) whether or not the U.S. Intelligence Community ("IC") targets individuals for the use of lethal force outside the United States, (ii) the Department of Defense's ("DOD") use of lethal force against targets in ongoing and past U.S. military operations in Syria, (iii) whether or not the IC or DOD has designated Plaintiff for the use of lethal force, and (iv) whether or not these entities possess information concerning Plaintiff.

Secretary of Defense Patrick M. Shanahan ("the Acting Secretary") meet all of the procedural requirements necessary for Defendants to assert the state secrets privilege in this case. Kareem in fact acknowledges that some information at issue in this matter may be appropriately protected from disclosure by the privilege. Nor does he contest that this privileged information is essential to establishing his claims, starting with the threshold question of whether or not he has standing to maintain this suit. With these concessions, Plaintiff principally argues that Defendants' assertions should not be accepted because the state secrets privilege does not apply to claims raising fundamental constitutional rights and because the Court can accommodate the competing interests of the parties by utilizing Classified Information Protection Act ("CIPA") procedures. He further claims that information in the public domain related to the U.S. Government's use of lethal force against U.S. citizens overseas undermines Defendants' privilege assertions in this case. None of Kareem's arguments has merit.

First, Kareem's argument that the long-standing state secrets doctrine does not apply in the face of his constitutional due process claim is foreclosed by binding precedent. The D.C. Circuit has expressly held that the state secrets privilege protects from disclosure evidence relevant to constitutional claims, and it has upheld the privilege in numerous cases that raised questions of fundamental constitutional rights. Courts also have upheld the privilege even where it would result in exclusion of evidence or dismissal in the face of constitutional claims concerning alleged ongoing intelligence activities. Likewise, Kareem's attempt to argue that the state secrets privilege should not apply here because his claim is analogous to a criminal prosecution has no merit.

Kareem's request that this Court employ CIPA or CIPA-like procedures in this case also fails. Of course, Congress crafted CIPA, to apply only in criminal cases, and courts reviewing state-secrets-privilege assertions have repeatedly rejected creating their own non-statutory, *ad hoc*

CIPA-like measures to further judicial review of such assertions.  In particular, courts have routinely refused in cases involving state secrets to order disclosure of classified information.  Moreover, no special procedure would protect the Government's interests here because state secrets are at the core of Kareem's claims and inherently are at risk of disclosure in any further proceeding.  In fact, the primary objective of his lawsuit is to obtain the disclosure of state secrets—including whether or not he has been designated for lethal force and, if so, the underlying factual basis.  Attempting to employ CIPA-like procedures would risk or require the very disclosures Plaintiff seeks and in itself eviscerate the Government's critical interests.

Finally, Kareem incorrectly contends that public information contradicts the DNI's and Acting Secretary's privilege assertions.  None of the public sources Kareem cites demonstrates an official acknowledgement of the privileged information implicated in this case.  Nor has he shown that this litigation could proceed solely on publicly available non-privileged information.

According proper deference to the DNI's and the Acting Secretary's considered judgment, the Court should uphold their assertions of the state secrets privilege and dismiss this case.

## ARGUMENT

### A.    Well-Established Precedent Requires Exclusion of the Privileged Information and Dismissal of This Action Irrespective of the Nature of Plaintiff's Claim.

Plaintiff contends that the state secrets privilege is superseded in this matter by the nature of the claim at issue—*i.e.*, that Defendants have allegedly targeted him for lethal action without due process of law.  Arguing that this matter is akin to a criminal proceeding, Kareem asks that the Court ignore an evidentiary rule barring the use of state-secrets-privileged information that finds its roots in over 200 years of this Nation's common law.  *See In re Sealed Case* (*Horn*), 494 F.3d 139, 142 (D.C. Cir. 2007) (citing the proceedings against Aaron Burr, *United States v. Burr*,

25 F. Cas. 30 (C.C.D. Va. 1807)).  The Court should reject his request to depart from this well-established precedent.

       1.    <u>Binding Precedent Regarding the State Secrets Privilege Requires Dismissal.</u>

The issue presented by Defendants' Motion is simply whether a long-recognized, constitutionally-based evidentiary privilege applies to exclude certain highly sensitive information from this litigation where there is a reasonable danger that disclosure would expose military and state secrets "which, in the interests of national security, should not be divulged."  *United States v. Reynolds*, 345 U.S. 1, 10 (1953).  As such, the analysis first articulated in *Reynolds*, and subsequently expounded on in numerous decisions of the D.C. Circuit, other circuit courts, and judges in this district provides the framework this Court must apply in ruling on the state secrets privilege.[2]  The merits question of whether the Government may target a U.S. citizen for lethal action without due process or what degree of process is due in such an exceptional, rare circumstance is not before the Court.  *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 7, ECF No. 27 ("Opp'n") (arguing that "[g]ranting the motion to dismiss would be tantamount to a holding that the state secrets privilege extinguishes the Fifth Amendment").  Nor should this Court construe Defendants' assertion of the state secrets privilege in this matter as a position by the Government that it can take lethal action against a citizen "without any of the protections afforded by the Constitution."  *Id.*

---

[2] The *Reynolds* framework presents a three-step analysis.  A court must first determine whether the Government has properly invoked the state secrets privilege.  *See Reynolds*, 345 U.S. at 7-8 (requiring a "formal claim of privilege," "lodged by the head of the department which has control over the matter," and made "after actual personal consideration by that officer").  The court must then decide based on a totality of the circumstances whether "there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged."  *Id.* at 10.  If it is so satisfied, the court must determine what impact the exclusion of privileged information has on the adjudication of the plaintiff's claims.  *See In re Sealed Case (Horn)*, 494 F.3d at 144.

The fact that Plaintiff raises due process claims does not warrant a different conclusion. As the D.C. Circuit explained in *In re Sealed Case (Horn)*, "the nature of the state secrets privilege compels the conclusion that the United States may claim the privilege as to evidence relevant to a constitutional claim."  494 F.3d at 143 (rejecting the argument that "the constitutional nature of [the plaintiff's] underlying claim [] entitles him to escape the binds of federal rules [of evidence]"). Indeed, numerous courts have addressed—and upheld—the assertion of the state secrets privilege under the *Reynolds* framework in cases that, like this one, challenged purported Executive actions that allegedly violated fundamental constitutional rights.  For example, in *In re Sealed Case (Horn)*, the D.C. Circuit determined that the state secrets privilege required dismissal of the plaintiff's *Bivens* action against federal agency employees for alleged Fourth Amendment violations related to claims of unlawful surveillance.  *Id.* at 141.  Likewise, on two occasions in *Halkin v. Helms*, the D.C. Circuit upheld an assertion of the state secrets privilege and dismissed claims alleging First, Fourth, Fifth, and Ninth Amendment violations related to the operation of certain alleged Government surveillance programs.  *See Halkin v. Helms*, 598 F.2d 1, 3 n.1, 9 (D.C. Cir. 1978) ("*Halkin I*"); *Halkin v. Helms*, 690 F.2d 977, 990-91 (D.C. Cir. 1982) ("*Halkin II*"). *See also El-Masri v. United States*, 479 F.3d 296, 299, 304 (4th Cir. 2007) (accepting an assertion of the state secrets privilege and dismissing a claim that the Central Intelligence Agency ("CIA") allegedly detained and interrogated the plaintiff in violation of the Fifth Amendment).

Kareem argues that these cases, and others cited in Defendants' Motion, are distinguishable because they involved claims related to allegations of past wrongs, rather than alleged future action of the type he speculates about here.  *See* Opp'n at 12-13.  Plaintiff, however, cites no authority for the proposition that the state secrets privilege can be asserted only in cases raising retrospective claims based on conduct that has ceased.  And in the numerous cases cited by Defendants in their

Motion, the question of whether the challenged action was past, present, or future did not factor into the courts' decisions to uphold assertions of the privilege and consequently dismiss claims. Such a distinction would be illogical.  "[I]t is the nature of the information at issue that guides the state secrets analysis, not the nature or status of the litigants" or the type or basis of the claims. *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, No. 13-cv-5032, 2015 WL 1344479, at *8 (S.D.N.Y. Mar. 23, 2015).[3]  Regardless of the truth of Kareem's allegations, the harms to national security that could result from litigating his claims flow directly from the fact that such allegations relate to purported actions not yet (or that may never be) taken by the Government.  *See* Shanahan Public Decl. ¶¶ 15-16, ECF No. 24-2 (describing harms of both confirming or denying whether or not an individual has been designated for the use of lethal force overseas); Coats Public Decl. ¶¶ 13-14, ECF No. 24-3 (same).

Indeed, the privilege has been upheld in instances where plaintiffs challenged alleged ongoing activities as violations of their constitutional rights.  In *ACLU v. NSA*, the Sixth Circuit held that the state secrets privilege prevented the plaintiffs from establishing standing to bring an action alleging that the National Security Agency ("NSA") had been and continued to unlawfully surveil the plaintiffs' communications in violation of the First and Fourth Amendments.  493 F.3d 644, 687-88 (6th Cir. 2007) (vacating the district court's order permanently enjoining the continuation of NSA's then-active Terrorist Surveillance Program ("TSP") and remanding for dismissal).  The Ninth Circuit likewise upheld the state secrets privilege in a similar action that

---

[3] The state secrets privilege itself is a constitutionally-based common law privilege rooted in the separation of powers.  The privilege to protect state secrets derives from the President's Article II authority over foreign affairs and national defense matters.  *See United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also El-Masri v. United States,* 479 F.3d 296, 303-304 (4th Cir. 2007) (noting the "constitutional dimension" of the privilege).  Thus, constitutional considerations are the foundation of protecting national security information in litigation and, where necessary, dismissing claims on that basis.

challenged the constitutionality of the TSP, which was still in operation at the time the plaintiffs filed suit.  *See Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1205 (9th Cir. 2007), *rev'g Al-Haramain Islamic Found., Inc. v. Bush*, 451 F. Supp. 2d 1215, 1218 (D. Or. 2006) (an action brought by the plaintiffs to enjoin alleged warrantless surveillance).

If anything, cases involving alleged ongoing or future national security actions are more suited for a state-secrets-privilege assertion, not less, because disclosure is even more likely to reveal the state of current or contemplated operational activities, plans, and capabilities—including the lack thereof—and provide insights to foreign adversaries that could cause *imminent* harm to the United States.  Relatedly, accepting the argument that Defendants cannot assert the state secrets privilege in such circumstances would invite suits by individuals—some of whom may seek to harm U.S. persons or interests—seeking to probe the scope of U.S. military operations and the extent of the Government's intelligence collection.  The state secrets privilege is thus an important safeguard against "groundless fishing expeditions."  *Sterling v. Tenet*, 416 F.3d 338, 344 (4th Cir. 2005).  Where courts "fail to take care to avoid unnecessary risks of disclosure when the privilege is invoked," the incentives for these fishing expeditions "correspondingly increase."  *Id.*

Moreover, the Court should not agree to Plaintiff's suggestion to abandon well-established precedent simply because excluding the privileged information from this litigation requires dismissal of Kareem's constitutional due process claim.  *See* Opp'n at 13.  The "consequence of *any* [] privilege" is that plaintiffs may be "deprive[d] . . . of power to assert their rights." *In re Sealed Case (Horn)*, 494 F.3d at 148 (emphasis added).  The state secrets doctrine recognizes that, in the exceptional case where the privilege is implicated, "the fundamental principle of access to the court must bow to the fact that a nation without sound intelligence is a nation at risk." *Sterling*, 416 F.3d at 348 (citing *Reynolds*, 345 U.S. at 11 ("even the most compelling necessity cannot

overcome the claim of privilege if . . . military secrets are at stake")).  The result is the same even where the plaintiff's claims are founded upon the Constitution.  *See In re Sealed Case (Horn)*, 494 F.3d at 143; *see also Halkin II*, 690 F.2d at 1001 ("'there may indeed be illegal or unconstitutional actions which will go unchallenged in a federal court due to the lack of a proper party to (bring suit),' [but] that is the result required here.").

    2.    <u>The Criminal Cases on Which Plaintiff Relies are Inapposite.</u>

Rather than contend with the long line of cases supporting dismissal of this action based on Defendants' assertions of the state secrets privilege, Plaintiff attempts to import the rights of and procedures available to criminal defendants, including defendants in capital punishment cases. *See* Opp'n at 4-7, 12-14.  But this is not a criminal proceeding, nor is it akin to one.[4]  And the Supreme Court in *Reynolds* itself distinguished between criminal proceedings brought by the Government—*i.e.*, proceedings the Government can choose not to pursue if the concern about risks of disclosure are too great—and civil cases brought *against* the Government, such as this, where the state secrets privilege may properly be invoked.  *Reynolds*, 345 U.S. at 12 (concluding that "the rationale of the criminal cases . . . has no application in a civil forum").  Unlike a criminal prosecution, Plaintiff here, and not the Government, is "in the driver's seat," *Sterling*, 416 F.3d at 344, whereas the Government is "a defendant only on terms to which it has consented," *Reynolds*, 345 U.S. at 12.  As a defendant in a civil case, the Government cannot simply dismiss the matter

---

[4] Similarly, this case is not like a challenge to the detention of an enemy combatant ("EC"), as in *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004).  *See* Opp'n at 6.  Importantly, *Hamdi* did not involve an assertion of the state secrets privilege.  Moreover, the purported decision challenged in this case differs profoundly from the type of post-capture classification decision challenged in *Hamdi*. Without confirming or denying his allegations, Kareem's claims involve alleged military and intelligence-community activities in an area of active hostilities, issues that are not involved in the context of reviewing an EC classification.  *See Hamdi*, 542 U.S. at 535 (holding that a "basic system of independent review" of an EC designation would not threaten military operations or "meddle[] . . . in the strategy or conduct of war," *id.* at 534-35).  The national security concerns at issue in this action bear no resemblance to *Hamdi*.

"if it fears the litigation presents unacceptable security risks." *Sterling*, 416 F.3d at 344.  The Government should not, therefore, be subjected to increased exposure "when it is compelled, for reasons of national security, to refuse to release relevant evidence." *Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983).

Plaintiff is not a criminal defendant and, like the Supreme Court in *Reynolds*, the Court should reject Plaintiff's effort to recast himself as one here.

**B.     The Court Should Reject Plaintiff's Request to Employ Special Procedures to Litigate His Claims.**

Plaintiff argues that the Court should balance the parties' conflicting interests and accommodate Defendants' national security concerns by using CIPA procedures.  *See* Opp'n at 9-11.  As noted, CIPA is plainly inapplicable to civil cases, however, and any attempt to apply special CIPA-like procedures in this case would risk unauthorized disclosure of information reasonably likely to cause harm to national security.

CIPA procedures have no application to civil cases such as this one.  Pub. L. No. 96-456, 94 Stat. 2025 (1980) (codified at 18 U.S.C. App. 3) ("An act to provide certain pretrial, trial, and appellate procedures for *criminal* cases involving classified information.") (emphasis added). Congress's central purpose in drafting CIPA was to establish a statutory mechanism to determine if classified information is relevant to a criminal prosecution and to protect that information if the Government decides to pursue a conviction.  If such information is relevant, the Government may, if necessary, choose to withdraw evidence, summarize evidence, dismiss charges, or dismiss an indictment in order to protect national security information.  As discussed above, the rationale that supports the use of CIPA in the criminal context "has no application in [this] civil forum." *Reynolds*, 345 U.S. at 12.

Moreover, it is a well-established principle that a civil litigant is not legally entitled to classified information. Pursuant to the President's Article II powers to conduct foreign affairs and provide for the national defense, the Executive Branch has the responsibility and the plenary discretion to classify and control access to national security information. *See Dep't of Navy v. Egan*, 484 U.S. 518, 527, 529 (1988) ("For reasons too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it.") (internal citation and punctuation omitted); *see also* Exec. Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010). Consistent with separation-of-powers principles, decisions about who may access or use classified information and under what circumstances reside with the Executive Branch. *See Egan*, 484 U.S. at 529-30; *CIA v. Sims*, 471 U.S. 159, 180 (1985) ("[I]t is the responsibility of [the Executive], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether [to disclose sensitive information].").

As a corollary to this principle, a federal district court may not compel the Executive to grant an opposing party, or any other person, access to classified information. *See, e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (emphasizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information"); *In re United States*, 1 F.3d 1251 (Table), 1993 WL 262656, at *9 (Fed. Cir. Apr. 19, 1993) (finding that "the access decisions of the Executive [Branch] may not be countermanded by either coordinate Branch"). Regardless of whether a court believes that disclosure of classified information is material to a plaintiff's claim, the Executive Branch retains constitutionally-vested discretion to determine access. *See Egan*, 484 U.S. at 527.

In cases involving the assertion of the state secrets privilege, courts have repeatedly rejected requests for disclosure of classified state secrets to a plaintiff's counsel, even under alternative measures like *in camera* review or CIPA procedures. *See, e.g.*, *Reynolds*, 345 U.S. at 10 (cautioning that *in camera* review of the information at issue may "jeopardize the security which the privilege is meant to protect"); *Ellsberg*, 709 F.2d at 61 ("It is well settled that a trial judge called upon to assess the legitimacy of a state secrets privilege claim should not permit the requester's counsel to participate in an *in camera* examination of putatively privileged material."); *Halkin I*, 598 F.2d at 7 (rejecting plaintiff counsel's request to participate in *in camera* proceedings under a protective order); *Restis*, 2015 WL 1344479, at *5 n.13 (finding that the plaintiff's reliance on CIPA and access procedures in Guantanamo *habeas* cases was unpersuasive in comparison with the "clear line of cases denying such requests where the Government has asserted the state secrets privilege"); *Sterling*, 416 F.3d at 348 (rejecting a plaintiff's request to devise "special procedures" to allow the suit to proceed).

Moreover, any attempt to utilize such a process here would inherently risk disclosure of the very information the Government seeks to protect—including whether or not Plaintiff is subject to lethal force. *See Reynolds*, 345 U.S. at 10 ("When … the occasion for the privilege is appropriate, [] the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers."). A state secrets privilege assertion does not put at issue a mere relevance determination, as is typically at issue in CIPA proceedings, but more fundamentally whether the disclosure of information sought in civil litigation would harm national security. The use of CIPA-like procedures would be "plainly ineffective" because the entire purpose of Kareem's suit and his requests for information "is to prove the existence of state secrets." *El-Masri v. Tenet*, 437 F. Supp. 2d 530, 539 (E.D. Va.

2006), *aff'd sub nom. El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007) (quoting *Sterling*, 416 F.3d at 348) (where "the whole object of the suit and of the discovery is to establish a fact that is a state secret" special procedures are inadequate)).  In *El-Masri*, the plaintiff brought a *Bivens* claim against a former CIA Director and unknown CIA agents for alleged violations of due process relating to his allegation that CIA unlawfully detained and tortured him.  *El-Masri*, 437 F. Supp. 2d at 534.  In granting the Government's motion to dismiss, the district court rejected the argument that "special procedures short of dismissal" would adequately "protect the government's validly asserted privilege."  *Id.* at 539.  As the court explained, "[t]o succeed on his claims, El–Masri would have to prove that he was abducted, detained, and subjected to cruel and degrading treatment, all as part of the United States' extraordinary rendition program."  *Id.*  Responding to these "threshold" claims "alone would reveal considerable detail about the CIA's highly classified overseas programs and operations."  *Id.*

The instant case presents the same scenario.  Whether as a threshold issue of standing or an elemental question of his due process claim, to succeed, Kareem would have to prove that he in fact has been designated by Defendants for the use of lethal force in the circumstances alleged. The DNI and the Acting Secretary have explained that confirming or denying this threshold claim reasonably could be expected to harm the national security of the United States.  *See* Shanahan Public Decl. ¶¶ 15-16; Coats Public Decl. ¶¶ 13-14.  Employing CIPA, or any other special procedure, will not alleviate that risk.  The very disclosures Plaintiff asks the Court to compel "in accordance with [CIPA]" *are state secrets*.  Opp'n at 9; *see id.* at 3-4 ("the Court . . . should order the government to disclose whether Mr. Kareem has been targeted for assassination and the factual basis for that designation").

At bottom, Plaintiff's suggestion that the Court impose "a judicial solution balancing" the

parties' interests conflicts with core principles of the state secrets doctrine. *Id.* at 3. Information that is subject to the state secrets privilege is "*absolutely* privileged from disclosure." *Halkin II*, 690 F.2d at 990 (emphasis added). In assessing this privilege assertion, courts do not weigh or balance the parties' equities. "No competing public or private interests can be advanced to compel disclosure of information found to be protected by the claim." *Ellsberg*, 709 F.2d at 57; *see El-Masri*, 479 F.3d at 306 ("no attempt is made to balance the need for secrecy of the privileged information against a party's need for the information's disclosure"). Although the Court can take into account Kareem's alleged need for the privileged information to determine the extent to which it should scrutinize the appropriateness of Defendants' privilege assertions, if the Court is ultimately satisfied that state secrets are implicated in this litigation, "even the most compelling necessity cannot overcome the claim of privilege." *Halkin II*, 690 F.2d at 990.

Kareem's request for the Court to apply CIPA-like procedures must therefore fail.

**C.    The Public Information Cited By Plaintiff Does Not Undercut Defendants' Assertion of the State Secrets Privilege.**

Plaintiff claims that some information relevant to his challenge is in the public domain and thus not subject to the state secrets privilege. Addressed in turn below, these claims are unavailing. None of the examples Kareem cites undermine the DNI's and the Acting Secretary's valid assertions of the state secrets privilege in this case. Nor do they establish facts that would allow this litigation to proceed to judgment in the absence of the privileged information.

1. Relying on statistics published by a non-profit organization, Plaintiff alleges that DOD has not publicly reported all of the airstrikes it conducts in Syria and questions whether the Acting Secretary's public declaration constitutes conclusive evidence that he was not

targeted in the airstrikes alleged in the Complaint.[5]  *See* Opp'n at 15-16.  Defendants disagree—

the Acting Secretary's public declaration states clearly that DOD has no record of air strikes on

the dates when, and in the vicinity where, Plaintiff Kareem claims he was targeted.  But Kareem's

argument only supports one of Defendants' key points.   As the Acting Secretary explained,

although publicly available records provide general information about military airstrikes in Syria,

these records "are derived from more detailed classified information about those past airstrikes[,]"

including "more precise data" about the location of, intended target of, and intelligence

information that led to the airstrikes.  Shanahan Public Decl. ¶ 12.  As his Opposition makes clear,

responding to Kareem's allegations about purported targeting operations would thus risk or require

the disclosure of this highly sensitive and properly protected information.

2.   That Executive officials have publicly discussed in broad, unclassified terms the

subject of the Government's targeted lethal operations overseas likewise does not defeat the

DNI's assertion of the state secrets privilege over whether the IC, in particular, targets

individuals for lethal force.  *See* Opp'n at 16-17.  To begin, the statements cited by Plaintiff,

such as the op-ed authored by then-retired CIA Director Gen. Michael Hayden and the speech by

former CIA Director John Brennan (then-Assistant to the President for Homeland Security and

Counterterrorism), do not specifically address, identify, or explain the precise role the IC may

play in any lethal action operations, and certainly do not reveal any of the particular information

---

[5] Plaintiff also alleges that the Acting Secretary "broadly asserts that military operations in Syria are secret," Opp'n at 15, but this plainly misreads the Acting Secretary's public declaration.  Instead, with respect to military operations, the Acting Secretary asserted the states secrets privilege over "classified details concerning the use of lethal force against terrorist targets in Syria," Shanahan Public Decl. ¶ 10, and "still classified information that relates to military operations in Syria, including past operations," *id.* ¶ 11.  There are, of course, some details about operations that DOD has publicly acknowledged, such as limited information regarding airstrikes in Syria targeting elements of al-Qa'ida and ISIS, which the Acting Secretary specifically described in his declaration.  *Id.*

at issue in this case concerning whether or not Kareem has been targeted.  *See id.* at 17-18.

Indeed, former Director Brennan carefully crafted his public statement to avoid disclosing any

sensitive national security information about the Government's targeting activities.[6]  Thus, these

statements are not an official acknowledgement of whether the IC targets individuals for lethal

action.  *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (officially disclosed

information must be "as specific as" and "match" information withheld); *see Afshar v. Dep't of

State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983).

Plaintiff also cites the Second Circuit's decision in *New York Times Co. v. U.S. Department

of Justice*, 756 F.3d 100, 122 (2d Cir. 2014), which, in light of public statements made by then-

CIA Director Leon Panetta, rejected CIA's "*Glomar*" response to a FOIA request seeking CIA

records concerning targeted lethal actions by the U.S. Government against U.S. citizens.  *See*

Opp'n at 16.  Defendants respectfully disagree with the *New York Times* ruling, but in any event

it does not stand for the proposition Plaintiff asserts.  Although the Second Circuit construed

certain official statements to acknowledge an undefined "operational role" by CIA in targeted

drone strikes conducted by the U.S. Government, it did not find that the CIA had acknowledged

that the agency itself had a "targeting program" or that the agency itself conducted lethal operations

against terrorist targets.  *See New York Times*, 756 F.3d at 122 n. 22.  Likewise, in parallel FOIA

litigation, the D.C. Circuit held that although CIA could acknowledge having an "intelligence

interest" in strikes conducted by the U.S. Government, *ACLU v. CIA*, 710 F.3d 422, 428 (D.C. Cir.

2013), the agency had not officially acknowledged "that the CIA itself operates drones," *id*. at

430.  As articulated in the DNI's public declaration, whether or not the IC (as opposed to the

---

[6] *See* John O. Brennan, "The Efficacy and Ethics of U.S. Counterterrorism Strategy," Apr. 30, 2012,   https://www.wilsoncenter.org/event/the-efficacy-and-ethics-us-counterterrorism-strategy ("I will not discuss the sensitive details of any specific operation today.  I will not, nor will I ever, publicly divulge sensitive intelligence sources and methods.").

broader U.S. Government) conducts those activities are classified state secrets. *See* Coats Public Decl. ¶ 12.

Finally, Plaintiff also cites a newspaper article from September 2015 reporting on a purported "secret campaign" by CIA and U.S. Special Forces to use lethal force against suspected terrorists in Syria. *See* Opp'n at 16-17. But the report relies entirely on anonymous sources, and an unsourced media report or "leak" does not constitute the type of "official and documented disclosure" that is required to establish a waiver of the Executive's ability to protect classified information. *ACLU v. DOD*, 628 F.3d 612, 621 (D.C. Cir. 2011) (explaining that leaked report could not be considered officially acknowledged); *ACLU v. U.S. Dep't of Justice*, 808 F. Supp. 2d 280, 297 (D.D.C. 2011) ("the statements of journalists, 'experts,' or even unofficial or unidentified sources (even were they CIA personnel) are not 'official' disclosures by the CIA").

To be sure, the Government has publicly acknowledged that it conducts airstrikes and other military operations against terrorist targets overseas. The D.C. Circuit has rejected the argument, however, that "'because some information about [a government] project ostensibly is now in the public domain, nothing about the project . . . can properly remain classified' or otherwise privileged from disclosure." *Halkin II*, 690 F.2d at 994; *see Edmonds v. U.S. Dep't of Justice*, 323 F. Supp. 2d 65, 76 (D.D.C. 2004), *aff'd sub nom. Edmonds v. U.S. Dep't of Justice*, 161 F. App'x 6 (D.C. Cir. 2005) ("the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations"); *see also El-Masri*, 479 F.3d at 302, 311 (President Bush's public acknowledgement of CIA's detention and interrogation program did not reveal operational details that properly remained state secrets); *Mohammed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1090 (9th Cir. 2010) ("partial disclosure of the existence and even some aspects of the extraordinary rendition

program does not preclude other details from remaining state secrets"). As explained in the DNI's and the Acting Secretary's public declarations, and as more fully explained in their *in camera* submissions, the facts essential to litigating Kareem's claims are not in the public domain and are properly privileged from disclosure. *See generally* Shanahan Public Decl.; Coats Public Decl.; *see also Al-Haramain*, 507 F.3d at 1205 (holding that, although President Bush officially confirmed the existence of the TSP and thus the general program was not a secret, information about whether or not the plaintiffs were targeted for surveillance under that program was properly protected under the state secrets privilege).

3. Plaintiff further contends that Defendants cannot "categorical[ly]" assert that information confirming an individual's designation for lethal force is a state secret, because the Government allegedly announced Anwar al-Aulaqi's targeting in advance of the 2011 airstrike that killed him.[7]  Opp'n at 21 n.12.  Here again, Plaintiff cites media reports that quote only anonymous sources and, as explained, this does not constitute official disclosures by the Government. *ACLU*, 628 F.3d at 621.  In fact, in a case brought by al-Aulaqi's father in 2010 to challenge his son's alleged designation, the DNI, Secretary of Defense, and CIA Director asserted the state secrets privilege over categories of information similar to the ones implicated in this case, including "information concerning possible operations in Yemen and any criteria or procedures that may be utilized in connection with such operations."  Opp'n to Pl.'s Mot. for Prelim. Inj. and Mem. in Support of Defs.' Mot. to Dismiss at 49, *Al-Aulaqi v. Obama*, No. 10-cv-1469 (D.D.C.), ECF No. 15.  Thus, contrary to Kareem's claim, the Government's position in *Al-Aulaqi* is

---

[7] Plaintiff also points to the fact that the Government publishes certain lists of individuals who are designated by Executive agencies as terrorists or that are suspected of committing terrorism-related criminal offenses. *See* Opp'n at 20.  These types of domestic enforcement activities—taken for the purpose of imposing sanctions and other restrictions or assisting federal law enforcement officials—are manifestly different from the existence and operational details of the alleged military and intelligence activities at issue here.

consistent with the privilege assertions in this matter. *Id.*, ECF No. 15-5 ¶ 7 (public declaration of then-Secretary of Defense Robert M. Gates asserting that official confirmation or denial of any operations the Government may plan to take against terrorist targets overseas "would risk serious harm to national security").

In any event, Plaintiff cites to no comparable official (or improper leaks) concerning any information about him at issue in this case. Courts have rejected similar attempts to undercut state-secrets-privilege assertions by reference to disclosures related to other cases. In *Halkin I*, the D.C. Circuit held that the Government was not "estopped" from asserting the privilege over whether it had intercepted the plaintiffs' communications while determining in another case that disclosure would be permissible. 598 F.2d at 9; *see Wever v. AECOM Nat'l Sec. Programs, Inc.*, No. 17-cv-200, 2017 WL 5139263, at *5 (E.D. Va. Jun. 15, 2017) (holding that, even if some sensitive information had been revealed in two other cases, "that would not undercut the need to prevent further disclosure of other sensitive information in this case"). The Court should likewise reject that argument here.

In this case, officials at the highest level of the IC and DOD have, after personal consideration, determined that disclosure of certain information implicated by Plaintiff's claims could reasonably be expected to cause serious, and in some instances exceptionally grave, harm to the national security of the United States. The Court must "'accord[] the utmost deference" to the DNI's and Acting Secretary's "expertise in assessing privilege" upon grounds of national security. *Edmonds*, 323 F. Supp. 2d at 77; *see El-Masri*, 479 F.3d at 305 ("the Executive and the intelligence agencies under his control occupy a position superior to that of the courts in evaluating the consequences of a release of sensitive information"). Whether or not Kareem

agrees, he has given no reason why the Court should afford Defendants' privilege assertions anything less than the "great weight" they are entitled. *See El-Masri*, 479 F.3d at 305.

4.   Finally, Plaintiff incorrectly asserts that the Court can resolve the merits of his due process claim using publicly available documents that discuss the circumstances in which the Government could use lethal force against a U.S. citizen in a foreign country. *See* Opp'n at 20.   In the first place, the Court should not reach the merits of Kareem's claims because he cannot establish standing in the absence of the privileged information. *See* Mem. In Support of Defs.' Mot. to Dismiss at 16-18, ECF No. 24-1 ("Defs.' Mem."). That information—whether or not Kareem actually has been targeted for lethal force—is properly protected by Defendants' privilege assertions. Ruling on the merits in these circumstances would be inappropriate. *See Halkin II*, 690 F.2d at 1000 (holding that where state secrets are necessary to establish the fact of the challenged executive action "it would be inappropriate to resolve the extremely difficult and important [constitutional] issue presented"); *see also ACLU*, 493 F.3d at 653-56; *Al-Haramain*, 507 F.3d at 1205.

Beyond the key threshold question of jurisdiction, the publicly available standards which Plaintiff "presum[es] would apply" are plainly inapplicable. Opp'n at 18.   In each of the sources cited by Plaintiff, the discussion of the lawfulness of lethal action operations is expressly limited to the contemplated use of such force in areas outside of active hostilities.[8]   Kareem's allegations,

---

[8] *See* Brennan, *supra* (discussing the standards and process of review for approval of targeted strikes against specific al-Qaida members outside "hot battlefields"); Dep't of Justice White Paper, *Lawfulness of a Lethal Operation Directed Against a U.S. Citizen Who Is a Senior Operational Leader of Al-Qa'ida or An Associated Force*, Nov. 8, 2011, https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/dept-white-paper.pdf   (setting forth a framework for considering "the circumstances in which the U.S. government could use lethal force in a foreign country *outside the area of active hostilities* against a U.S. citizen") (emphasis added); Mem. for the Attorney General, *Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi*, Jul. 16, 2010, https://www.justice.gov/sites/default/files/olc/pages/attachments/2015/04/02/2010-07-16_-

however, pertain to alleged airstrikes that occurred in Syria, which is and was during the timeframe relevant to Kareem's allegations an area in which the U.S. Armed Forces conducts airstrikes and other necessary operations against ISIS and al-Qaida forces. *See* Defs.' Mem. at 21 n.10. Moreover, as explained by the Acting Secretary, the process by which a determination is made to designate terrorist targets in Syria for the use of lethal force is classified and constitutes a state secret. *See* Shanahan Public Decl. ¶ 10. Disclosure of this highly sensitive information could reasonably result in harm to the national security by compromising the U.S. military's operational capability and providing terrorist targets with insights into military planning. *Id.* ¶ 15.

Resolving the merits of Kareem's due process claims would therefore unquestionably risk or require the disclosure of information protected by the state secrets privilege. As Defendants have shown, privileged information would be intertwined at every step of the Court's review— from the elemental question of whether or not Kareem has been targeted for lethal force, to inquiries into any processes or criteria that may be used to authorize lethal action overseas and any underlying factual information upon which a purported designation is allegedly based. *See* Defs.' Mem. at 20-22. Because the information needed to litigate this case, from standing forward to the merits, is properly protected by Defendants' privilege assertions, further proceedings would "unjustifiably risk disclosure of state secrets." *Jeppesen*, 614 F.3d at 1090.

## CONCLUSION

For the reasons explained above, and in Defendants' Motion, the Court should dismiss Plaintiff Kareem's remaining claims.

---

_olc_aaga_barron_-_al-aulaqi.pdf (analyzing the lawfulness of a contemplated lethal force operation that would occur in Yemen "far from the most active theater of combat between the United States and al-Qaida").

Dated: April 25, 2019                 Respectfully submitted,

                                      JOSEPH H. HUNT
                                      Assistant Attorney General

                                      ANTHONY J. COPPOLLINO
                                      Deputy Branch Director


                                      _/s/ Kathryn C. Davis_____
                                      KATHRYN C. DAVIS (D.C. Bar No. 985055)
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      1100 L Street, N.W.
                                      Washington, D.C. 20530
                                      Tel: (202) 616-8298
                                      Fax: (202) 616-8460
                                      Email: Kathryn.C.Davis@usdoj.gov

                                      *Counsel for Defendants*